111 N.J. Super. 477 (1970)
268 A.2d 556
ACADEMY SPIRES, INC., PLAINTIFF,
v.
WALTER BROWN, DEFENDANT.
Superior Court of New Jersey, Essex County, District Court.
Decided July 13, 1970.
*479 Mr. Norman Malzberg for plaintiff.
Miss Nadine Taub for defendant.
YANOFF, J.D.C.
This controversy concerns the applicability of Marini v. Ireland, 56 N.J. 130 (1970); Reste Realty Corp. v. Cooper, 53 N.J. 444 (1969), and Academy Spires v. Jones, 108 N.J. Super. 395 (Law Div. 1970), to a multi-family dwelling in which tenant seeks an abatement in rent by reason of landlord's failure to supply services.
Landlord instituted a dispossess proceeding under N.J.S.A. 2A:18-53(b) for nonpayment of rent at the rate of $163.17, of which $156.17 is for the apartment and $7.00 for parking, for the months of December 1969 to March 1970, inclusive, plus a balance of $28.70 for the month of November 1969. Tenant deliberately withheld payment for three months because of alleged failure on the part of landlord to supply services, and denied that any additional rent was unpaid. I find as a fact that the rent for four months has not been paid, and that there is no balance due for November 1969.
Tenant asserts that the rental rate is $135 for the apartment, not $156.17. Landlord's position with relation thereto is that the $156.17 figure is the approved F.H.A. *480 rental for the five-room apartment in question, and I have no reason to question this fact. The evidence shows, however, that the agreement between tenant and landlord's superintendent was that the apartment would rent for $135 per month. The approved F.H.A. amount is merely the maximum permitted rental and the tenant is not bound thereby. 12 U.S.C.A. § 1747c.
Tenant did not move. However, I take judicial notice that there is a great shortage of housing accommodations in Essex County. Evidence Rule 9(1). Therefore, it would be unreasonable to require tenant to move as a prerequisite to abatement of rent. Marini, supra.
The apartment in question is on the ninth floor of a complex housing 400 tenants, with a large parking area.
Tenant's defenses fall into two categories: first, that landlord has failed to provide electric illumination in compliance with a Newark ordinance, for the parking lot, by reason of which the agreement for parking lot fee is illegal and unenforceable; and second, invoking Marini, supra, that landlord has failed, after notice, to supply essential services, rendering the premises uninhabitable, at least in part, entitling tenant to diminution in rent.
The first problem is determined easily. Factually, there is no evidence that landlord has failed to meet the standards set by section 7:424.6 of the Newark Building Code. Legally, the illegality specified affects only peripheral aspects of landlord's performance in supplying parking space. This is not a case where the agreement was made for the purpose of violating a statutory prohibition, as in Brooks v. Cooper, 50 N.J. Eq. 761 (E. & A. 1893). Nor is it a case where a housing code explicitly prohibited rental of premises in violation of the code, as in Brown v. Southall Realty Co., 237 A.2d 834 (D.C. App. 1968), or where a zoning ordinance prohibited the use of the premises for which it was leased, as in Ober v. Metropolitan Life Ins. Co., 157 Misc. 869, 284 N.Y.S. 966 (N.Y. City Ct. 1935); Becerra v. Hochberg, 193 Cal. App.2d 431, 14 Cal. Rptr. *481 101 (D. Ct. App. 1961), and Howell v. City of Hamburg Co., 165 Cal. 172, 131 P. 130 (Sup. Ct. 1913). Nor is it a case where plaintiff could not recover because he was not licensed for the pursuit for which he sought compensation, as in George H. Weinrott & Co. v. Burlington Housing Corp., 22 N.J. Super. 91, (Ch. Div. 1952). Rather, the facts are that tenant could and did use the parking area, despite the code violation, if any. Indeed, the precise area allotted to tenant was probably well lighted. A more appropriate analogy is Associated Realties Corp. v. Million Dollar Pier Operating Co., 6 N.J. Super. 369 (App. Div. 1950), in which the lease required tenant to use the premises seven days a week in violation of a "Sunday" law, and it was held that the fact that tenant could operate the premises six days a week overcame the defense of illegality. Accord: Stern Holding Co. v. O'Connor, 119 N.J.L. 291 (Sup. Ct. 1938). The illegality here was slight; tenant had already gotten the benefit of the parking area, and denial of recovery would amount to forfeiture. In such case landlord should not be denied its price. Restatement, Contracts, § 600, at 1115 (1932). See Rutkowsky v. Bozza, 77 N.J.L. 724 (Sup. Ct. 1909); Fox v. Rogers, 171 Mass. 546, 50 N.E. 1041 (Sup. Jud. Ct. 1898); Phend v. Midwest Engineering & Equipment Co., 93 Ind. App. 165, 177 N.E. 879 (App. Ct. 1931).
Whether Marini is authority for tenant's position is more troublesome. Marini involved a two-family house in which tenant rented an apartment by a written lease specifying that the premises be used for no purpose other than a dwelling. There was no specific covenant to repair. The toilet bowl in tenant's apartment leaked. Tenant gave repeated notice to landlord, who failed to repair. Thereupon tenant engaged a plumber, who made the repair at a cost of $85.72. The question was whether tenant could credit this expenditure against the rent in a dispossess proceeding. The trial court held that he could not; the Supreme Court reversed and sent the case back for trial. The Supreme Court ruled:
*482 1. Tenant could raise the issue of diminution in amount of rent due by reason of landlord's failure to supply services in a dispossess proceeding.
2. A covenant that the premises "were habitable and fit for living" was implied because "indispensable to carry into effect the purpose of the lease" (56 N.J. at 143).
3. Tenant's covenant to pay rent and landlord's covenant of habitability were not necessarily independent, and could be construed as dependent, "according to the intention of the parties and the good sense of the case" (at 145), in the context of a dispossess case. It thus followed the logic of Reste Realty Corp. v. Cooper, 53 N.J. 444 (1969), where contract concepts of dependency of obligation and failure of consideration were applied in a case in which tenant had been forced to vacate the premises by landlord's failure to perform an implied covenant of habitability.
In my judgment, these basic principles control this case.
Although there is no written agreement, there was an agreement under which the premises were rented, in which the covenant of habitability was implied.
Tenant asserts this was broken because landlord failed to supply heat and water service to a ninth-story apartment; the incinerator did not function, impairing garbage disposal; the hot water supply failed; water leaked into the bathroom; there were defects in venetian blinds; the plaster in the walls was cracked, and the apartment was unpainted. Some of these clearly go to bare living requirements. In a modern society one cannot be expected to live in a multi-storied apartment building without heat, hot water, garbage disposal or elevator service. Failure to supply such things is a breach of the implied covenant of habitability. Malfunction of venetian blinds, water leaks, wall cracks, lack of painting, at least of the magnitude presented here, go to what may be called "amenities." Living with lack of painting, water leaks and defective venetian blinds may be unpleasant, aesthetically unsatisfying, but does not come within *483 the category of uninhabitability. Such things will not be considered in diminution of the rent.
It is argued that Marini is restricted to its facts, and is applicable only when tenant has made the repairs; that tenant's choice is to repair or move out. The court's language in Marini is cited:
If, therefore, a landlord fails to make the repairs and replacements of vital facilities necessary to maintain the premises in a livable condition for a period of time adequate to accomplish such repair and replacements, the tenant may cause the same to be done and deduct the cost thereof from future rents. The tenant's recourse to such self-help must be preceded by timely and adequate notice to the landlord of the faulty condition in order to accord him the opportunity to make the necessary replacement or repair. If the tenant is unable to give such notice after a reasonable attempt, he may nonetheless proceed to repair or replace. This does not mean that the tenant is relieved from the payment of rent so long as the landlord fails to repair. The tenant has only the alternative remedies of making the repairs or removing from the premises upon such a constructive eviction. [56 N.J. at 146]
This language, however, must be considered in the light of the facts before the court in Marini. On those facts the court granted relief to the tenant. To conclude that on other facts coming within the broad principles enunciated, not only in Marini but in Reste, the tenant may not have relief, would be to place an emphasis on form, technicality and fiction which has long been foreign to this State. Yannuzzi v. United States Casualty Co., 19 N.J. 201, 212 (1955); Edelstein v. City of Asbury Park, 51 N.J. Super. 368 (App. Div. 1958); Hackensack v. Rubinstein, 37 N.J. 39, 51 (1962), and many other cases, make that clear in matters of procedure. Henningsen v. Bloomfield Motors, 32 N.J. 358 (1960); Unico v. Owen, 50 N.J. 101 (1967); Newmark v. Gimbel's Inc., 54 N.J. 585 (1969), apply the same principles as to issues of substance.
There was conflicting evidence on the question of notice of defect to landlord, but I find this fact in favor of tenant. The superintendent admitted knowledge of nonfunction *484 of heating system, hot water, elevator service and incinerator. The only issue as to these was how long the deficiency existed.
Was the tenant required to make the repairs to this 400-unit complex as a prerequisite to availability of the relief given by Marini? If the answer to that question is in the affirmative, Marini has no meaning to tenants in multi-family dwellings who need the relief most. Obviously, few such tenants have the means to lay out the capital, and if they do, why should they repair someone else's real estate on the chance of a reduction in rent? It is hard to believe that the Supreme Court intended such a result.
The thrust of law in this State is in the direction of consumer protection. Viewed from this aspect, Marini is in the stream of thought blazed by Henningsen v. Bloomfield Motors, supra, followed by Unico v. Owen, supra; Wollerman v. Grand Union Stores, Inc., 47 N.J. 426 (1966). Lemle v. Breeden, 462 P. 2d 470 (Hawaii Sup. Ct. 1969), and Pines v. Perssion, 14 Wis. 2d 590, 111 N.W.2d 409 (Sup. Ct. 1961), both cited in Marini, are examples of application of this approach to landlord and tenant relations. In both it was held that a tenant need not move out of the premises in order to set up the defense of nonhabitability. More explicit is the language of Judge Wright in Javins v. First National Realty Corp., 428 F.2d 1071 (D.C. Cir. May 7, 1970), where he said:
Our approach to the common law of landlord and tenant ought to be aided by principles derived from the consumer protection cases referred to above. In a lease contract, a tenant seeks to purchase from his landlord shelter for a specified period of time. The landlord sells housing as a commercial businessman and has much greater opportunity, incentive and capacity to inspect and maintain the condition of this building. Moreover, the tenant must rely upon the skill and bona fides of his landlord at least as much as a car buyer must rely upon the car manufacturer. In dealing with major problems, such as heating, plumbing, electrical or structural defects, the tenant's position corresponds precisely with "the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, *485 and to decide for himself whether they are reasonably fit for the designed purpose.
He continued:
Thus we are led by our inspection of the relevant legal principles and precedents to the conclusion that the old common law rule imposing an obligation upon the lessee to repair during the lease term was really never intended to apply to residential urban leaseholds. Contract principles established in other areas of the law provide a more rational framework for the apportionment of landlord-tenant responsibilities; they strongly suggest that a warranty of habitability be implied into all contracts for urban dwellings.
For academic discussion of the problems involved, see Schoshinski, "Remedies of the Indigent Tenant; Proposal for Change," 54 Georgetown L.J. 519 (1966); Loeb; "The Low Income Tenant in California; A Study in Frustration," 21 Hastings L.J. 287 (1970); Feldman, "Effective Remedies for Tenants," 93 N.J.L.J. 481 (1970).
The most difficult aspect of this case is determination of the amount of abatement to which tenant is entitled. No expert testimony was produced to show the fair value of the premises without the services which landlord was required to supply. Tenant urges that this be done on a finding of fact that there has been a percentage reduction in use which entitles tenant to a corresponding abatement in rent. There is almost a complete absence of authority on the subject. The Model Residential Landlord-Tenant Code (Tent. Draft 1969), American Bar Foundation, § 2-207(1) (b) would entitle the tenant to withhold one-fourth of the rent accrued during any period when hot water is not supplied. Section 2-207(2) (b) would allow the tenant to procure substitute housing for as long as heat or water is not supplied (between October 1 and May 1), during which time the rent shall abate and the landlord shall be liable for any additional expense incurred by the tenant, up to one-half the amount of the abated rent. In Charles E. Burt, Inc. v. Seven Grand Corp., 340 Mass. 124, 163 N.E.2d 4 (Sup. Jud. Ct. 1959), *486 the court indicated that if the tenant remained in possession until successful disposition of the action, his rent liability would be limited to the difference between the lease-fixed rent and the reasonable rental value of the premises in their defective condition. Academy Spires v. Jones, supra, sets forth the same theory.
These approaches are compatible with tenant's position. It is not inconsistent with rules generally applicable in determining damages.
It has been said that "No rule of damages capable of precise application in all cases can be laid down and followed. The proper and just method varies with the facts of the particular case." Borbonus v. Daoud, 34 N.J. Super. 54, 60 (Ch. Div. 1955); Zeliff v. Sabatino, 15 N.J. 70, 74 (1954).
In McCormick, Damages (1935), § 27, at 101, the author states:
There are various modifications of the rule of certainty. They enable the courts, while holding up a high standard of certainty as an ideal, to avoid harsh applications of it. Among them are:
(a) If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference.
(b) Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty.
(c) Mere difficulty in ascertaining the amount of damage is not fatal.
(d) Mathematical precision in fixing the exact amount is not required.
(e) If the best evidence of the damage of which the situation admits is furnished, this is sufficient.
Triers of fact daily translate personal injuries into money damages with relatively slight guidelines. Profits lost by reason of breach of contract may be recovered "if there are any criteria by which probable profits can be estimated with reasonable certainty." Feldman v. Jacob Branfman & Son, Inc., 111 N.J.L. 37, 42 (E. & A. 1933). The language in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), is appropriate:
*487 Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person. * * * In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. [at 563, 51 S.Ct. at 250]
The percentage-diminution approach advocated by tenant seems likely to produce results sufficiently accurate to be compatible with rules as to proof of damages set forth above. I am dubious that use of expert testimony could add to either accuracy or certainty. Certainly, if tenant were required to bear the cost of producing an expert witness, the effectiveness of the relief afforded by Marini would be diminished. I therefore accept the percentage abatement theory advocated by tenant.
There is a wide disparity between tenant and landlord's testimony as to the extent of diminution of service, but landlord admits that heat, hot water, elevator service and incinerator use failed at various times during the period December 1969 to March 1970, and that repairs were made from time to time. Had landlord produced records of repair bills more precise determination of the periods during which service failed might have been possible. Tenant testified that in the child's bedroom there was no heat during the entire period; that complaint was made to the superintendent without avail, and that the child slept in the living room by reason thereof. He testified that there was no hot water for substantial periods in November, December and March, as the result of which water was heated on the stove for bathing; that the living room lacked heat in November and December; that two out of three elevators failed to function in November, December and two weeks in March, and that the incinerator was defective throughout the period.
The superintendent denied that the breakdowns were for such extended periods. He said that the heating system never broke down for more than six-hour periods; that a service *488 repaired the elevators promptly; that the incinerator broke down for a day to a day and one-half in November, and two weeks in December, during whirh garbage cans were used. He attributed much of the difficulty with the incinerator to vandalism.
I am convinced that tenant exaggerated, and that the superintendent testified from ignorance. I find as a fact that there was a breach of the covenant of habitability, and that the diminution in rent of 25% is a fair amount. There will therefore be a judgment that tenant is indebted to landlord for rent in the amount of $433. If that amount is not paid within three days, a warrant for possession will issue.
No costs.