BRIAN McKENNA *vs.* BERNARD BEGIN.

Franklin.    February 17, 1977. — May 11, 1977.

Present: KEVILLE, GRANT, & BROWN, JJ.

*Landlord and Tenant,* Habitability.    *Damages,* Breach of warranty.

In an action for breach of an implied warranty of habitability, the plaintiff was not entitled to recover damages from the time he moved in as a cotenant and shared the rent with the original tenant but only from the time when the plaintiff and the landlord reached an agreement making the plaintiff a tenant after the original tenant had moved out. [308]

In an action for breach of an implied warranty of habitability, the judge did not abuse his discretion in finding that the plaintiff was not entitled to recover damages for minor violations of the State Sanitary Code. [308]

In an action for breach of an implied warranty of habitability, the judge erred in measuring damages for major violations of the State Sanitary Code by amortizing the cost of remedying the defects over the remaining useful life of the building. [308-310]

Damages for breach of an implied warranty of habitability were to be measured by reducing the tenant's rent by a percentage reflecting

the diminution in the value of the use and enjoyment of the leased premises by reason of the existence of defects which gave rise to the breach. [310-312] BROWN, J., concurring.
In an action for breach of an implied warranty of habitability, the landlord would be liable in damages for defects which he knew were in existence when the tenancy began even though he had repaired the defects after receiving notification of their existence from the board of health. [312]

BILL IN EQUITY filed in the Superior Court on March 8, 1973.

On remand after appeal to this court, the suit was heard by *Moriarty*, J.

*Steven J. Schwartz* (*James A. Bisceglia* with him) for the plaintiff.

KEVILLE, J.  This case returns to us following its remand to the Superior Court for computation by the trial judge of the damages owed to a tenant by his landlord for breach of the implied warranty of habitability. Under that warranty principle, first fully elaborated in this Commonwealth in *Boston Housing Authy.* v. *Hemingway*, 363 Mass. 184 (1973), the judge had awarded damages to the plaintiff McKenna against his landlord, the defendant Begin, for violations of the State Sanitary Code[1] in the latter's apartment building, as certified by the Greenfield board of health.

The judge recognized that according to the *Hemingway* case the measure of damages was to be the difference between the value of McKenna's apartment as warranted and the rental value of that apartment in its defective condition. However, in his application of that formula the judge calculated the damages by subtracting the rent agreed upon, which he took to be the rental value of the premises in their defective condition, from the rent paid

---

[1] Article II of the State Sanitary Code, which established minimum standards of fitness for human occupation in housing, was adopted by the Department of Public Health on September 13, 1960, under authority granted to it by G. L. c. 111, § 5. That authority is now contained in G. L. c. 111, § 127A, as amended through St. 1975, c. 706, § 174.

for other apartments in the building, which the judge
found to be the value of the premises as warranted.

We remanded the case (see *McKenna* v. *Begin,* 3 Mass.
App. Ct. 168 [1975]) to the Superior Court for a further
hearing for the proper computation of the damages based
upon the formula established in the *Hemingway* case,
*supra,* at 203. In our earlier opinion, we held that the rent
agreed upon could not be taken by the judge as evidence
of the rental value of the premises in a defective condition
but as the rental value of the premises as warranted to be
habitable. Under the formula applied by the judge, rental
of defective premises would be tantamount to a waiver of
the landlord's implied obligation to let and maintain the
premises in a habitable condition and would amount to a
waiver of the statutory provisions for the enforcement of
the State Sanitary Code.[2] *McKenna,* 3 Mass. App. Ct. at
170-171. While, following the *Hemingway* case, we did not
attempt to furnish precise guidelines for the valuation of
defective premises, we suggested that consideration be
given to various factors including, but not limited to, the
nature, duration and seriousness of the defects and whether
they might endanger or impair the health, safety or well
being of the occupants. *McKenna,* 3 Mass. App. Ct. at 172.
We also ruled that damages were to be computed from
the inception of the tenancy if it were shown that the
defective conditions existed at that time. But, if the de-
fects arose during the tenancy, damages were to be com-
puted from the time when the landlord first knew or was
notified of their existence. *Id.* at 174.

On remand, the judge found that McKenna's tenancy
started in June, 1972, when J. Steven Flynn, the original
tenant, who had taken in McKenna as a cotenant, moved
out and McKenna approached Begin with a view to con-
tinuing his occupancy of the apartment. Although the

---

[2] Permitting a landlord to assert that the rent agreed upon took ex-
isting defects into account would sanction a "black market" in sub-
standard housing. See Note, 84 Harv. L. Rev. 729, 737 (1971).

judge found that McKenna had been occupying the apartment with Flynn for some months prior to June, 1972, and had been paying half the rent to Flynn, he concluded that Begin's mere acquiescence in the arrangement did not make McKenna his tenant. In the absence of evidence of a specific earlier date on which McKenna and Begin reached an agreement making McKenna a tenant, the judge found that the tenancy began on June 25, 1972. Because he found that the major defects for which he awarded damages existed at the outset of the tenancy, he computed damages from that date. In this appeal McKenna argues that he is entitled to damages from the date on which he first occupied the apartment and he disputes the method employed by the judge in computing damages.

The judge determined that McKenna was not entitled to damages for several defects described by the board of health as minor violations of the code.[3] He estimated that the cost of repairing those defects which were found by the board to be major violations would have been $840, that is, $40 to repair three broken windows and $800 to install an adequate second means of egress from the apartment to the ground and an adequate electrical system.[4] He then calculated that if the $840 with interest were amortized over the anticipated remaining useful life of the building in which the apartment was located, the cost would be approximately $2 a week. The judge concluded that $2 a week represented the amount by which the rental value of McKenna's apartment was diminished for lack of those improvements. Consequently, he awarded $2

---

[3] The board cited the following minor violations: loose and falling plaster in a bedroom, falling ceiling plaster and a leaking pipe in the bathroom, missing plaster and peeling ceiling paint in the kitchen and falling plaster and leaking roof in a common area hallway.

[4] The board of health also cited three major violations in the basement of the building — a leaking sewer line, a large hole in a foundation wall, and a rotted floor. The judge awarded no damages for these violations, however, because he found that they were repaired immediately after Begin was notified of them by the board of health.

in damages to McKenna for each of the fifty-five weeks of his tenancy, or a total of $110.

We think the judge was correct in assessing damages only from June, 1972, when Flynn moved out and McKenna first spoke to Begin about continuing the tenancy alone. A tenancy at will cannot be created without the consent of both parties. *Maguire* v. *Haddad*. 325 Mass. 590, 593 (1950). *Iorio* v. *Donnelly*, 343 Mass. 772 (1961). *Bruce* v. *Harvard Trust Co.* 1 Mass. App. Ct. 373, 375 (1973). While there may have been implied consent by Begin to McKenna's joint occupancy of the apartment with Flynn, McKenna has not met his burden of proving that Begin agreed to accept McKenna as a tenant any earlier than June, 1972.

We also agree with the judge that McKenna is not entitled to receive damages for the minor code violations in this case. As we emphasized in our earlier opinion, not every defect gives rise to a diminution in rental value, and it has been held that isolated violations may be found not to constitute a breach of the warranty of habitability. *Hemingway*, 363 Mass. at 200-201, n.16. *Javins* v. *First Natl. Realty Corp.* 428 F. 2d 1071, 1082, n.63 (D.C. Cir.), cert. den. 400 U. S. 925 (1970). On the other hand, there may be instances in which minor violations in conjunction with major violations or a multitude of minor violations with a cumulative effect on habitability should be taken into consideration in reducing rent. In all cases, however, the trial court is given broad discretion to determine whether defects constitute material breaches of the warranty of habitability. *Hemingway, supra.* It does not appear that the judge abused his discretion in deciding that the minor code violations in this case not be considered in determining the adjustment to which McKenna was entitled.

However, we disagree with his method of determining the damages attributable to major violations. Basically, he computed the damages by finding the fair rental value of the defective premises to be the agreed upon rent less

the amortized cost of repairing the major code violations. Thus McKenna's damages became the cost of repairing the major defects amortized over the remaining useful life of the building. Rather than measuring the damages by amortizing the cost to Begin of remedying the defects, we believe that the damages should have been calculated in a manner which more closely reflects the diminution in the value of McKenna's use and enjoyment of the premises. One of the established aims of determining damages for breach of contract is to put the injured party in the position he would have been in if performance had been rendered as promised. *Ficara* v. *Belleau*, 331 Mass. 80, 82 (1954). *Concannon* v. *Galanti*, 348 Mass. 71, 74 (1964). Corbin, Contracts § 992 (1964). 22 Am. Jur. 2d Damages § 46, at 73 (1965). It is true that in many contract cases involving defective performance the measure of damages is the reasonable cost of correcting remediable defects. *DiMare* v. *Capaldi*, 336 Mass. 497, 502 (1957), and *Concannon, supra* (both involving defects in construction of a house). *Restatement of Contracts* § 346 (1932). McCormick, Damages § 169 (1935). 22 Am. Jur. 2d Damages § 49, at 78 (1965).

An assumption behind this general rule is that the party injured by the breach is in a position to pay to have the defects remedied. However, one of the bases for judicial acceptance of the warranty of habitability in residential leases is the realization that tenants, particularly low income tenants in multiunit houses or apartment buildings, are usually not in a position to be able to authorize or afford the repair of serious code violations. *Hemingway*, 363 Mass. at 198, quoting from *Javins*, 428 F. 2d at 1078-1079. See *Academy Spires, Inc.* v. *Brown*, 111 N.J. Super. 477, 484 (1970). It is unlikely that McKenna could have afforded $840 to remedy the major violations found in this case. Even if McKenna had availed himself of the provisions of G. L. c. 111, § 127L, inserted by St. 1972, c. 799, and had withheld rent to make certain of the repairs, the statute at that time limited the withholdings to a total

of two months' rent, which would have been less than $100 in this instance.[5]

The judge's method of computing the damages could produce some anomalous results. For example, for the same defects a tenant in a new building would receive lower damages than a tenant in an older building because the cost of repairs would be amortized over the longer useful life of the new building. Similarly, with respect to defects affecting more than one tenant, tenants in a larger building would receive lower damages than tenants in a smaller one because repair costs would be divided among a greater number of dwelling units. It is our view that the damages for breach of the warranty of habitability with respect to a given living space should not be dependent on external factors such as the age of the building or the number of dwelling units in the building.

To fashion a measure of damages which more closely reflects the actual injury suffered by McKenna we adopt a percentage reduction of use approach, under which McKenna's rent is to be reduced by a percentage reflecting the diminution in the value of the use and enjoyment of the leased premises by reason of the existence of defects which gave rise to the breach of warranty of habitability. See *Green* v. *Superior Court*, 10 Cal. 3d at 639, n.24, citing with approval *Academy Spires, Inc.* v. *Brown*, 111 N.J. Super. at 477, and *Morbeth Realty Corp.* v. *Rosenshine*, 67 Misc. 2d 325 (N.Y. Civ. Ct. 1971). See also Note, 84 Harv. L. Rev. 729, 737 (1971).

Pursuing this method, the trial court on remand is to

---

[5] The statute, which was approved July 19, 1972, shortly after McKenna's tenancy began, provided that where a landlord has been notified by the board of health of code violations which may endanger the health, safety, or well being of a tenant and has failed to repair the violations, the tenant may repair them himself and deduct the cost from his rent payments as they become due. Statute 1975, c. 274 (effective June 3, 1975), which amended c. 111, § 127L, extended the limitation to four months' rent. But even that would have been short of the amount needed to repair the major violations found to exist in this case. This "repair and deduct" statute was apparently designed to remedy less expensive defects. See *Green* v. *Superior Court*, 10 Cal. 3d 616, 630-631 (1974).

assess the major code violations and determine the percentage by which the use and enjoyment of the apartment has been diminished by the existence of those violations. The court is to determine the percentage reduction factor applicable to each major violation, total the percentages to arrive at an aggregate percentage reduction factor, and then assess as damages that percentage of McKenna's weekly rent for each of the weeks during which the defects remained unrepaired.

We recognize that computing damages under this approach involves some uncertainty. Useful expert testimony is unlikely to be readily available as to the "worth" of the defects (see *Morbeth Realty Corp.* v. *Valez*, 73 Misc. 2d 996, 1001-1002 [N.Y. Civ. Ct. 1973]), and even if it were available, the imposition upon indigent tenants of the financial burden of supplying expert witnesses would seriously diminish the effectiveness of the relief contemplated in our earlier opinion. See *Academy Spires, Inc.* 111 N.J. Super. at 487. See also Note, 84 Harv. L. Rev. 729, 736 (1971).

However, damages in this case "do not differ significantly from a host of analogous situations, in both contract and tort law, in which damages cannot be computed with complete certainty." *Green* v. *Superior Court*, 10 Cal. 3d at 638. It is settled that mere uncertainty in assessing the amount of damages should not jeopardize an injured party's right to recover as long as those damages are the certain result of the wrongdoing. *Story Parchment Co.* v. *Paterson Parchment Paper Co.* 282 U. S. 555, 562 (1931). *Academy Spires, Inc., supra,* at 486. McCormick, Damages § 27 (1935). A wrongdoer may not complain that damages cannot be measured precisely where he alone is responsible for the harm. *Story, supra,* at 563. *McCormick, supra.* While the damages may not be determined by speculation or guess, an approximate result is permissible if the evidence shows the extent of damages to be a matter of just and reasonable inference. *Story, supra.* We think that in this case the judge can fairly compute damages on a percentage reduction basis upon consideration of the evidence

already before him; but he is to be free to entertain additional evidence if he deems it advisable.

One other point warrants mention. McKenna argues that code violations in common areas of the building such as the hallways and the basement should have been considered in awarding damages. We agree in principle that violations in common areas which detract from a tenant's use or enjoyment of the portion of the premises leased to him can result in damages against the landlord. See *Javins,* 428 F. 2d, at 1082, n.62. In this case, however, the judge found the hallway violations to be minor, not affecting the habitability of the premises, a conclusion which does not appear to be an abuse of discretion. The judge excluded the major defects in the basement from his award because he found that they were repaired after Begin was notified of their existence by the board of health (note 4, *supra*). However, as we have already observed, Begin is liable in damages for defects which he knew were in existence when the tenancy began. Although there was evidence that code violations existed prior to the board of health inspection, the judge made no finding whether the basement violations existed at the outset of the tenancy. On remand the judge is to make a finding on this point and if the violations did exist from the outset, he is to determine whether they caused a diminution in the value of McKenna's use and enjoyment of the premises and compute damages on the basis of that determination.

The judgment is reversed and the case remanded to the trial court for computation of damages under the formula described herein. No costs are awarded to either party.

*So ordered.*

BROWN, J. (concurring). I concur with the majority that in general it is appropriate to remand cases involving breaches of the warranty of habitability to the Superior Court to allow it to determine the portion of rent to be rebated to the tenant. However, it seems to me that under the reasoning of *Boston Housing Authy.* v. *Hemingway,*

363 Mass. 184 (1973), the rental value of the unit must be zero when the board of health condemns the apartment. In the *Hemingway* case the Supreme Judicial Court recognized that in an urban society "the essential objective of the leasing transaction is to provide a dwelling suitable for habitation." 363 Mass. at 196-197. The delivery of an apartment in habitable condition is the consideration for payment of rent. As the promise to pay rent and the promise to maintain the apartment in a habitable condition are mutual and interdependent covenants, the breach of the warranty of habitability is "a partial or *complete* defense to the landlord's claim for rent owed for the period when the dwelling was in uninhabitable condition and the landlord or his agent had written or oral notice of the defects" (emphasis added). 363 Mass. at 202-203. The court in *Hemingway* explicitly recognized the possibility of a rental value of zero: "If the tenant elects to stay on until the end of the term and the landlord makes no repairs, the tenant will be liable for the reasonable value, *if any*, of his use of the premises for the time he remains in possession" (emphasis added). 363 Mass. at 202. See also *McKenna* v. *Begin*, 3 Mass. App. Ct. 168, 171-172 (1975) ("it is possible, in a given instance, for substantial defects to reduce the fair rental value of the premises to zero").

In the instant case the tenant paid for his own heat, hot water, and electricity. Thus the consideration given in exchange for the rent was the structure — which was so defective that the board of health condemned it as unfit for human habitation. It would seem that in such circumstances there is no obligation to pay rent. Accordingly, where the unit was unfit for human habitation, as here, there was a failure of consideration and the rental owed — the value of the apartment — should be zero.

Moreover, as the tenant paid for utilities himself, and the landlord made no outlays for repairs, there is no unjust enrichment to the tenant in abating the rent, whereas requiring payment of rent would unjustly enrich the owner.

Whether or not the rent is abated completely from the

beginning of the tenancy, public policy considerations dictate that it must abate completely after the condemnation of the unit. The decision of the board of health — as an administrative body which is presumably more expert than a court in judging the condition of apartment units — that the unit was unfit for habitation should be conclusive in the court's determination of the habitability and value of the unit. Even more importantly, to permit payment of rent where a unit has been condemned is to frustrate the policy of the administrative agency (the board of health) of preventing occupation of buildings that are unsafe and dangerous to health because awarding rent for such a unit encourages the owner to continue to rent the unit despite its condition.

Finally, where a contract is in violation of a statute and public policy, it is illegal and unenforceable. A lease agreement which is knowingly made despite the existence of violations of the sanitary code which make the dwelling uninhabitable is an illegal agreement which is unenforceable. *Brown* v. *Southall Realty Co.* 237 A.2d 834 (D.C. 1968). See *Diamond Housing Corp.* v. *Robinson,* 257 A.2d 492, 494-495 (D.C. 1969), revd. 463 F. 2d 853 (D.C. Cir. 1972).