

# In the Missouri Court of Appeals
## Eastern District

<u>DIVISION TWO</u>

| | | |
|---|---|---|
| KOHNER PROPERTIES, INC., | ) | No. ED103133 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | |
| | ) | |
| LATASHA JOHNSON, | ) | Honorable Judy Preddy Draper |
| | ) | |
| Defendant/Appellant. | ) | Filed: September 13, 2016 |

<u>Introduction</u>

Latasha Johnson (Appellant) appeals from the trial court's judgment in favor of Kohner Properties, Inc. (Respondent) on Respondent's suit in rent and possession for unpaid rent.[1] We transfer to the Missouri Supreme Court pursuant to Rule 83.02.[2]

<u>Factual and Procedural Background</u>

On October 31, 2014, Appellant entered into a lease with Respondent to rent the premises at 3543 DeHart Place, Apartment 1. The lease provided for $585.00 per month in rent and a $200.00 security deposit. Appellant moved into the apartment that day and immediately noticed problems with the only bathroom. Appellant wrote on her move-in sheet that the shower was missing tiles and there were cracks in the bathroom floor. Appellant testified the stove was also not working properly and there were some issues

---

[1] Respondent's Motion for Attorney Fees on Appeal is denied.
[2] All rule references are to Mo. R. Civ. P. 2016, unless otherwise indicated.

with the blinds. While moving in, Appellant asked the property manager about the bathroom floor and was told there was "nothing [they] could do."

In November 2014, a water leak appeared in the ceiling above the shower. The leak began as a drip but developed into a stream. Shortly thereafter, mold began growing on the ceiling. Appellant reported the leak and mold via Respondent's telephone service line and by personally speaking with the maintenance technician.

Records indicate on November 29, 2014, Appellant made a service request regarding two tiles that had fallen off the shower wall. The tiles were placed back on the wall by Respondent's maintenance technician. According to the property manager, the property was built in the 1950s and "[t]iles are going to start popping."

Records indicate that over the course of December 2014, Appellant reported an issue with a board under the kitchen sink, her range would not light and the oven was not functioning properly, and the tiles had fallen off the bathroom wall again. Respondent's maintenance technician replaced the board, turned on the gas to the stove, and put the tiles back up on the bathroom wall. Shortly thereafter, Appellant reported an electrical shortage in a bedroom. Respondent's maintenance technician replaced a light switch in the bedroom and installed some new blinds.

On February 10, 2015, Appellant contacted Respondent again about the mold on the bathroom ceiling and the cracked, unstable bathroom floor. Appellant testified the condition of the floor continued to deteriorate during her tenancy. Respondent's maintenance technician responded the following day, at which time he "cleaned [the] mold area" and requested that a supervisor look at the floor.

On March 1, 2015, Appellant withheld her rent payment because her maintenance requests regarding the leak in the bathroom ceiling, the mold, and the floor were not resolved.

On March 17, 2015, at 2:00 a.m., the bathroom ceiling above the shower collapsed. Appellant placed an emergency service request. Respondent's maintenance technician responded later that morning and determined the bathtub above Appellant's apartment was leaking. After "repairing" the tub spout in the bathroom upstairs, Respondent taped a black plastic bag over the hole in the ceiling. The leak persisted, however, and water collected in the plastic and pulled at the tape on the ceiling. Appellant repeatedly asked Respondent to repair the leak and the hole in her ceiling but Respondent failed to do so. At the time of trial, in April 2015, both the leak and the ceiling remained unrepaired.

As a result of the leaking water, Appellant was only getting "minimum" use of the bathroom. Although Appellant continued to use the shower to bathe, her young daughter with cerebral palsy was unable to use the bathtub for bathing and was only able to be in the bathroom for short periods of time. Appellant testified the mold and air conditions in the bathroom aggravated her daughter's allergies and irritated her daughter's eyes to the extent her eyes were beginning to droop.

Since the collapse, Appellant and her daughter have stayed at a hotel three or four nights at her own expense. Appellant testified she is still living in the apartment and has not yet been able to secure other housing due, in part, to a lack of resources. Appellant testified that while she withheld her March and April rent, she had to expend some of that money for hotel rooms. Appellant has applied for other housing in her daughter's school

district, but she has been repeatedly rejected because she does not meet the minimum income requirements. Appellant stated she lives in a low-income area and that it takes time to find housing within her price range.

On March 20, 2015, Respondent filed a lawsuit against Appellant seeking unpaid rent and possession of the premises. Appellant filed an answer; affirmative defenses, including a breach of the implied warranty of habitability; and a two-count counterclaim for violation of the Missouri Merchandising Practices Act and a common law breach of lease alleging violation of the implied warranty of habitability. The case went to trial on April 21, 2015.

Prior to opening statements, Respondent moved to bar Appellant's affirmative defense and counterclaim for breach of lease based on the implied warranty of habitability, asserting such could not be raised because Appellant failed to pay her rent to the court *in custodia legis*.[3] The court overruled Respondent's motion and the case proceeded to trial.

The court took the case under submission and, on May 13, 2015, entered its Order and Judgment against Appellant for $2,104.36 in rent, late fees, attorney's fees and court costs and awarded possession of the premises to Respondent. The court found the credible evidence demonstrated that, at the time of trial, the hole in the ceiling remained covered by plastic, the hole had not been repaired, and water continued to drip from the hole and plastic covering the ceiling. The court found Appellant was barred from asserting the affirmative defense or counterclaim of implied warranty of habitability because she failed to either vacate the premises or tender her rent to the court *in custodia*

---

[3] *In custodia legis* is defined as "[i]n the custody of the law" and is used in reference to property placed in the court's charge pending litigation over the property. *Black's Law Dictionary* 836 (9th ed. 2009).

4

*legis* as required by <u>King v. Moorehead</u>, 495 S.W.2d 65 (Mo. App. W.D. 1973). The

court also found Respondent breached the maintenance clause of the lease agreement and

awarded Appellant a $300 set-off for hotel costs. This appeal follows.

Points on Appeal

In her first point on appeal, Appellant argues the trial court erred in barring her

from asserting the affirmative defense of breach of the implied warranty of habitability

on the grounds she had not vacated the premises or tendered her rent to the court *in*

*custodia legis* because doing so is not a legal prerequisite to asserting the affirmative

defense of breach of implied warranty of habitability.

In her second point on appeal, Appellant argues the trial court erred in barring her

from asserting a counterclaim for breach of the implied warranty of habitability on the

grounds she had not vacated the premises or tendered her rent to the court *in custodia*

*legis* because doing so is not a legal prerequisite to asserting a breach of implied warranty

of habitability counterclaim.

Discussion

The central issue in the case is whether a tenant who remains in possession of

leased premises must tender her unpaid rent to the court *in custodia legis* as a prerequisite

to raising a defense of or counterclaim for a breach of the implied warranty of habitability

in a rent and possession suit against her.

King v. Moorehead

<u>King v. Moorehead</u>, 495 S.W.2d 65 (Mo. App. W.D. 1973) is the seminal case in

Missouri on the implied warranty of habitability. The <u>King</u> court provided a thorough

history of the relevant common law, including the traditional doctrine of *caveat emptor*

5

and the evolution of this doctrine as applied to tenants purchasing an estate in land. Id. at 68-73. The court recognized that modern housing leases are not purely conveyances of property interests with independent covenants to perform but are also bilateral contracts, and examined existing judicially created exceptions to the doctrine of *caveat emptor*. Id. at 71.

The King court justified the reappraisal of the common law principles of landlord-tenant law in favor of finding an implied warranty of habitability in residential leases due to (1) the landlord's superior bargaining power as a result of contemporary housing shortages, (2) housing codes requiring the landlord to repair and maintain the property in compliance with housing codes including Enforcement of Minimum Housing Code Standards Act (Housing Code Enforcement Act), Section 441.500 et seq,; (3) the landlord's superior knowledge of the condition of the premises including latent defects and of housing requirements and violations, and (4) the residential lessee's position as a purchaser of "a well known package of services" who relies on the lessor to provide habitable housing. Id. at 71-72.

The court further examined legislative actions that altered the common law, such as the enactment of the Housing Authorities Law, Chapter 99, originally enacted in 1939, and the 1969 enactment of the Housing Code Enforcement Act. King, 495 S.W.2d at 73-75. The purpose of the Housing Code Enforcement Act is to coerce landlords to repair conditions harmful to the life, health, and safety to occupants resulting from violations of the housing code. Id. at 73. Under the statute, if a landlord failed to make the requisite repairs within a reasonable time after receiving notice, a receiver appointed upon the petition of the code enforcement agency or the requisite number of tenants was

6

authorized to collect rent and encumber the property to pay for abatement of the housing code violations. Id.[4]

Based on these factors, the court ruled:

> [A] lease is not only a conveyance but also gives rise to a contractual relationship between the landlord and tenant from which the law implies a warranty of habitability and fitness by the landlord. Under contract principles a tenant's obligation to pay rent is dependent upon the landlord's performance of his obligation to provide a habitable dwelling during the tenancy….A more responsive set of remedies are thus made available to the tenant, the basic remedies for contract law, including damages, reformation and rescission.

King, 495 S.W.2d at 75-76.

The King court held that every residential lease contains:

> an implied warranty by the landlord that the dwelling is habitable and fit for living at the inception of the term and that it will remain so during the entire term. The warranty of the landlord is that he will provide facilities and services vital to the life, health and safety of the tenant and to the use of the premises for residential purposes. It is an obligation which the landlord fulfills by substantial compliance with the relevant provisions of an applicable housing code.

Id. at 75.

The implied warranty of habitability developed, in part, as a response to a chronic and prolonged housing shortage, particularly for low-income households. King, 495 S.W.2d at 76. The remedy of the implied warranty of habitability is necessary because common law constructive eviction, which requires the tenant to abandon the premises, is an insufficient remedy for low-income tenants. Id. Constructive eviction creates a

---

[4] The statute in effect in 1973 provided that a civil action could be maintained under the Housing Code Enforcement Act on the ground that a nuisance existed with respect to a dwelling by the municipality or one-third of the tenants. Section 441.510 RSMo 1969. The statute was amended in 1993 to allow certain not-for-profits and owners or tenants within 1,200 feet of the nuisance property to bring suit. In 1998, the statute was amended to allow only the county or municipality to bring an action. In 2001, the statute was amended again and now allows only the county, municipality, local housing corporation, or neighborhood association to bring an action under the Act. Thus, tenants occupying a noncompliant dwelling have no personal right of action under the statute.

7

dilemma for tenants, forcing them to either "continue to pay rent and endure the conditions of untenability or abandon the premises and hope to find another dwelling which, in these times of severe housing shortage, is likely to be as uninhabitable as the last." Id. at 76-77.

The King court stated:

This dilemma is avoided by recognizing that the modern lease is a bilateral contract so that the tenant's obligation for rent is dependent upon the landlord's performance of his responsibilities, among them, his implied warranty of habitability. Breach of this duty justifies retention of possession by the tenant and withholding of rent until habitability has been restored.

Id. at 77.

The tenant must plead and prove a material breach of the warranty in order to prevail. In determining whether a condition constitutes a material breach, the court should consider, among other factors:

the nature of the deficiency or defect[;] its effect on the life, health or safety of the tenant[;] length of time it has persisted[;] and the age of the structure. Minor housing code violations which do not affect habitability will be considered *de minimis*. Also, the violation must affect the tenant's dwelling unit or the common areas which he uses. The tenant is under an obligation to give the landlord notice of the deficiency or defect not known to the landlord and to allow a reasonable time for its correction. The contract principle that a person may not benefit from his own wrong will exonerate a landlord for a defect or deficiency caused by a tenant's wrongful conduct.

Id. at 76.

The court went on to say, "A tenant who retains possession, however, shall be required to deposit the rent as it becomes due, *in custodia legis* pending the litigation." Id. The court found this procedure "assures the landlord that those rents adjudicated for distribution to him will be available to correct the defects in

8

habitability" and encourages the landlord to minimize the tenant's damages by making tenantable repairs at the earliest time.  Id.  The court found the trial court had discretion to make partial distributions of the escrowed funds to the landlord pending litigation when necessary to prevent an irreparable loss to the landlord. Id.  The court in King concluded this procedure was most compatible with the policy of the legislature, local housing codes, and the need to preserve and maintain an adequate supply of habitable housing.  Id. at 77.

### Detling v. Edelbrock

Eleven years later, the Missouri Supreme Court in Detling v. Edelbrock, 671 S.W.2d 265 (Mo. banc 1984) (abrogated on other grounds), adopted the implied warranty of habitability established by King and the reasoning set forth therein.

In doing so, the Detling Court looked to the evolution of the common law, the modern acceptance of a lease as both a conveyance and a contract and the rejection of *caveat emptor* in transactions for the purchase of a new home.  Id. at 268-69. Furthermore, the Court recognized the enactment of local housing codes imposed new duties on property owners and the state legislature's enactment of the Housing Code Enforcement Act encouraged compliance with local housing and building regulations by creating a state remedy for municipalities and tenants against the owners of buildings failing to meet local housing code standards.  Id. at 269.[5]

The Court noted:

The statute authorizes only three limited remedies which courts are authorized to order: (1) the payment of present and future rents due from occupants into the court, § 441.570(1); (2) permitting "the owner to draw upon the rents deposited in the court to pay for the cost of necessary

---

[5] Again, the Housing Code Enforcement Act has since been amended such that tenants no longer have a right of action under the statute.

repairs ..." § 441.590.1(1); and (3) the appointment of a receiver to administer the rent moneys paid into the court in order to abate the nuisance, § 441.590.1(2). The legislature's authorization of these remedies suggests it desired to establish a statutory mechanism by which a nuisance could be abated through the direct use of the tenant's rent. The creation of such a mechanism is not in itself an adequate substitute for the various existing remedies available at common law or under municipal regulatory schemes for dealing with the abatement of and the damages caused by nuisances. We believe it is clear that the legislature intended the Act to be cumulative of these other remedies.

Detling, 671 S.W.2d at 272.

In adopting the implied warranty of habitability, the Court specifically found the Housing Code Enforcement Act was not the exclusive remedy of tenants occupying sub-habitable housing. Detling, 671 S.W.2d at 271-72. Instead, a tenant could pursue traditional contract remedies. Id. at 270. "Tenants may use a breach of the warranty both as a defense to a landlord's action for possession and rent [] and as the basis for an affirmative suit for damages." Id. at 270. When raised as an affirmative suit, tenants may seek to recover damages for impaired enjoyment of the premises and consequential damages. Id.

To state a cause of action for breach of the implied warranty of habitability, the tenant must allege facts satisfying the following elements: (1) entry into a lease for residential property; (2) the development of a dangerous or unsanitary condition materially affecting the life, health, and safety of the tenant; (3) reasonable notice of the defect to the landlord; and (4) the landlord's failure to restore the premises to habitability. Detling, 671 S.W.2d at 270.

Is There An <em>In Custodia Legis</em> Requirement?

In this case, prior to trial on Respondent's rent and possession lawsuit, Respondent moved to bar Appellant's affirmative defense and counterclaim based on

10

Respondent's alleged violation of the implied warranty of habitability because Appellant had remained in possession of the premises but had not deposited her rent to the court pursuant to King's assertion that "[a] tenant who retains possession...shall be required to deposit the rent as it becomes due, *in custodia legis* pending the litigation." King, 495 S.W.2d at 77. Appellant objected, asserting this language was nonbinding *dicta*. The court initially allowed Appellant's evidence to be admitted but subsequently barred Appellant's defense and counterclaim in its Order and Judgment based on King. The parties maintain their respective positions on appeal.

The Missouri Supreme Court discussed the importance of distinguishing a court's holding from *dicta* in State ex rel. Baker v. Goodman, 274 S.W.2d 293, 297 (Mo banc 1954):

> There is no doctrine better settled than that the language of judicial decisions must be construed with reference to the facts and issues of the particular case, and that the authority of the decision as a precedent is limited to those points of law which are raised by the record, considered by the court, and necessary to a decision.

A careful review of King demonstrates its pronouncement that a tenant asserting a claim of breach of the implied warranty of habitability, who retains possession of the premises, is required to deposit his rent with the court pending litigation is nonbinding *dicta*.

In King, the landlord sued a tenant for rent and possession. King, 495 S.W.2d at 67. After losing in the magistrate court, the tenant appealed to the circuit court. Id. At the time of her appeal to the circuit court, the tenant had already vacated the premises and she raised breach of the implied warranty of habitability as a defense to her withholding of rent. Id. Because the tenant had already vacated the premises, any alleged

11

precondition to bringing the defense or counterclaim when the tenant remained in possession was not before the court and was unnecessary to the decision.

We also reject Respondent's contention that <u>King</u>'s *dicta* was established as legal precedent in <u>Wulff v Washington</u>, 631 S.W.2d 109 (Mo. App. W.D. 1982) and <u>Tower Management, Inc v. Henry</u>, 687 S.W.2d 564 (Mo. App. W.D. 1984). Like <u>King</u>, <u>Wulff</u> involved a tenant who vacated the premises prior to raising the defense and the court found the <u>King</u> "requirement" to be inapplicable. 631 S.W.2d 109-110. In <u>Henry</u>, 687 S.W.2d at 565, the circuit court barred the tenants' implied warranty of habitability counterclaim because they failed to escrow their rent as it became due even though they remained in possession. The only issue on appeal was whether the tenants' appeal bond satisfied the escrow "requirement." <u>Id.</u> at 566. The <u>Henry</u> court rejected the tenants' argument because an appeal bond serves different purposes than funds escrowed in the circuit court. <u>Id.</u> There is no indication the tenants ever challenged the propriety of the <u>King</u> escrow requirement itself. <u>Id.</u>

Furthermore, we reject Respondent's contention the Missouri Supreme Court implicitly adopted the <u>King</u> *in custodia legis* requirement in <u>Detling</u>, 671 S.W.2d 265, by favorably citing to <u>King</u> and because the <u>Detling</u> tenants effectively complied with the <u>King</u> requirement by paying their rent to a court-appointed receiver. While <u>Detling</u> adopted the implied warranty of habitability established by <u>King</u> and quoted extensively from the case, <u>Detling</u> did not adopt the <u>King</u> *in custodia legis* requirement via citation, quotation, or rationale. Instead, the <u>King</u> requirement is conspicuously absent from the opinion, including the Court's holding as to the claim's essential elements. <u>Detling</u>, 671 S.W.2d at 270. Nor can it be said the Court implicitly adopted the requirement because

12

the Detling tenants fulfilled the requirement by paying their rent to the court-appointed receiver. In Detling, the tenants brought an action against the landlord raising several claims, including a claim under Housing Code Enforcement Act. Id. at 267. The Detling tenants sought appointment of the receiver and payment thereto as part of their claim under the Act. Id. The Detling Court specifically found the tenants were not limited to remedies under the Act and never indicated the King *in custodia legis* requirement was (1) being adopted or (2) satisfied by the tenants' compliance under the Act. Moreover, most of the Detling tenants had vacated the premises as a result of the untenable conditions so it is unclear the extent to which the King requirement could even be said to apply to the Detling tenants. Id.

While the parties argue the implications of several competing cases, there appears to be no case that clearly addresses the *in custodia legis* requirement following King. That being said, and the parties agree, some circuit courts seem to accept the *in custodia legis* requirement as established law. Several secondary sources, citing to King, agree. See 36 Mo. Prac., Landlord-Tenant Handbook §§ 1:1, 23:8; and 18A Mo. Prac., Real Estate Law §52:18. King's declarations on this issue, however, are *dicta* and thus there is currently no binding legal authority *requiring* a tenant who remains in possession of the premises to pay their withheld rent *in custodia legis* prior to being able to raise the landlord's breach of the implied warranty of habitability as a defense or counterclaim in the landlord's rent and possession action.

### Should There Be An *In Custodia Legis* Requirement?

The issue then is whether this Court should adopt the King *in custodia legis* requirement. By establishing the right to the implied warranty of habitability, King

13

expanded the common law and set forth a new judicially created remedy in landlord-tenant disputes. In doing so, the court attempted to balance the rights and interests of the parties before it and to establish guiding principles for future litigation.

As King notes, the implied warranty of habitability was intended to provide a remedy to low-income households faced with limited housing options by allowing the tenant to retain possession and withhold rent until habitability was restored, a remedy not then available to the tenant. King, 495 S.W.2d at 77 ("Breach of this duty justifies retention of possession by the tenant and withholding of rent until habitability has been restored."). The underlying rationale is that people living in poverty may lack the ability or option of relocating even when presented with what is commonly considered to be an untenable condition. Courts have recognized that tenants faced with serious unsafe or unhealthy conditions which a landlord fails to address in a reasonable amount of time are sometimes forced to remediate the situation at their own cost by making the necessary repairs or seeking alternative accommodations or housing. See Pugh v. Holmes, 253 Pa. Super. 76, 88-90, 384 A.2d 1234, 1240–41 (1978), aff'd, 486 Pa. 272, 405 A.2d 897 (1979) (tenant may assert breach as a defense or as a counterclaim and seek reimbursement or a rent reduction for reasonable sums expended by the tenant for repairs made to make the dwelling habitable); and Marini v. Ireland, 56 N.J. 130, 146, 265 A.2d 526, 535 (1970) (tenant may make repairs and replacements of vital facilities necessary to maintain the premises in a livable condition when landlord fails to do so after adequate period of time and deduct the cost thereof from future rents).

As both King and Detling recognized, a breach of the implied warranty of habitability entitles the tenant to pursue traditional contract remedies, including damages

14

and consequential damages when raised in an affirmative suit. <u>King</u>, 495 S.W.2d at 75-76; <u>Detling</u>, 671 S.W.2d at 270. To automatically require every tenant to escrow her entire withheld rent payment dilutes the very remedy the implied warranty establishes. Such an inflexible requirement potentially creates a new dilemma for impoverished tenants to (1) use their rent money to seek new housing or to remediate the condition or its deleterious effect and be prevented from countersuing or defending against the landlord, or (2) continue to pay or escrow their rent and live in unsafe and unsanitary conditions in order to pursue the claim in court.

The <u>King</u> court was concerned about maintaining an adequate supply of habitable dwellings and fashioned the *in custodia legis* procedure to assure "the landlord that those rents adjudicated for distribution to him will be available to correct the defects in habitability, and will also encourage the landlord to minimize the tenant's damages by making tenantable repairs at the earliest time." <u>King</u>, 495 S.W.2d at 77. It is unclear, however, why a landlord is entitled to the special protection of being assured of recovery on a monetary judgment before the tenant can even raise an otherwise permissible defense or counterclaim. See Missouri Supreme Court Rules 55.08 and 55.32 (rules governing affirmative defenses and counterclaims, respectively, do not contain general requirement that a party escrow funds as a precondition to raising an affirmative defense or bringing a counterclaim).

Furthermore, it is unclear how barring a tenant's viable defense or counterclaim for failing to escrow her withheld rent "encourage[s] the landlord to minimize the tenant's damages by making tenantable repairs at the earliest time" or helps maintain an adequate supply of habitable dwellings. Landlords have alternative incentives to

15

maintain their rental properties in habitable condition, including the financial incentive to rent the premises for the maximum profit and a legal incentive to lawfully maintain the property in compliance with local housing codes. Instead, armed with the knowledge that a low-income tenant faces a potentially insurmountable financial barrier to raising a legal defense in a rent and possession action, landlords lose incentive to quickly repair the condition because they may be able to avoid making necessary repairs while still collecting full rent.

Such a severe limitation on a tenant's ability to raise a breach of the warranty as a defense or counterclaim places unnecessarily burdensome restrictions on the remedy. The implied warranty of habitability applies only in extreme situations where living conditions pose risks to the *life, health, or safety* of the tenant, through no fault of their own. Minor housing code violations are insufficient to sustain a claim. See <u>Acad. Spires, Inc. v. Brown</u>, 111 N.J. Super. 477, 482; 268 A.2d 556, 559 (Dist. Ct. 1970) (failure to provide heat, hot water, and garbage removal are violations of implied warranty of habitability but malfunction of blinds, minor water leaks, wall cracks, and lack of painting go to amenities and, while unpleasant or aesthetically unsatisfying, do not come within the category of uninhabitability). See also <u>Detling</u>, 671 S.W.2d at 270 (material and substantial violations of municipal codes including roach and rodent infestations, missing screens, exposed wiring, boiler malfunctions, water leakage, rubbish, and unstable steps can constitute violation of warranty); <u>King</u>, 495 S.W.2d at 68 (rodent and vermin infestation, defective and dangerous electrical wiring, leaking roof, inoperative toilet, unsound and unsafe ceilings); <u>Lemle v. Breeden</u>, 51 Haw. 426, 428; 462 P.2d 470, 472 (1969) (rodent infestation violation of implied warranty); <u>Kolb v.</u>

16

DeVille I Properties, LLC, 326 S.W.3d 896, 903 (Mo. App. W.D. 2010) (bedbug

infestation violation of implied warranty); and 43 Am. Jur. Proof of Facts 3d 329 §§ 10-

13.5 (1997) (2016 update) (common conditions that render a premises unfit for human

habitation include insect and rodent infestation; water leakage through roofs, ceilings,

and walls; mold; and faulty plumbing and electric).

Furthermore, the landlord's interests are protected, in part, because a claim under

the implied warranty can be sustained only if the landlord received notice of the condition

and has been given a reasonable time to repair said condition. Detling, 671 S.W.2d at

270. Also, tenants who withhold rent without sufficient justification, *i.e.,* for *de minimis*

conditions as opposed to those that pose risks to their life, health, or safety, or otherwise

fail to establish their right to abate or withhold rent, are in default of the lease and the

landlord may pursue the remedies available to him, including damages provided by the

contract such as *per diem* penalties, late fees, or attorney's fees.

Other Jurisdictions

Many jurisdictions do not automatically require tenants in possession to escrow

rent with the court in order to raise a breach of the implied warranty. In fact, the majority

of courts which permit rent withholding as a remedy under the warranty allow the tenant

to retain his rent, subject to the court's discretionary power to order the tenant to deposit

his rent with the court. Restatement (Second) of Property §11.3 note 2 (1977) (2016

update). "This approach provides relief to the tenant while at the same time protecting

the landlord's valid interest in the property." Id. Requiring a tenant to place the full

amount of rent into escrow penalizes the tenant by requiring him to pay for more than he

received from the landlord. Restatement (Second) of Property §11.3 note 4 (1977) (2016

17

update). See also, <u>Pugh</u>, 486 Pa. at 292 (declining to institute mandatory escrow procedure, finding determination of whether a tenant should deposit all or some of the withheld rent into escrow lies within the sound discretion of the trial court, with the court considering the seriousness and duration of the alleged defects and the likelihood the tenant will prevail); <u>Javins v. First National Realty Corp.</u>, 428 F.2d. 1071, 1083, n.67 (D.C. Cir. 1970) (noting an escrow requirement might be a good procedure to follow but not requiring such); <u>Bell v. Tsintolas Realty Co.</u>, 430 F.2d 474, 484 (D.C. Cir. 1970) (discussing considerations for the court in entering an order requiring tenant to pay rent into court registry pending litigation, including factors supporting an amount less than the contracted-for rent, amount the tenant spent on repairs, and concern that a "tenant's financial condition may render the original burden so heavy as to preclude litigation of meritorious defenses"); <u>Hinson v. Delis</u>, 26 Cal. App. 3d 62, 71; 102 Cal. Rptr. 661 (Ct. App. 1972), <u>disapproved of on other grounds by Knight v. Hallsthammar</u>, 29 Cal. 3d 46, 623 P.2d 268 (1981) (court may, at the request of either party, require the tenant to make rental payments at the contract rate into court as they become due for as long as the tenant remains in possession); and <u>Teller v. McCoy</u>, 162 W.Va. 367, 393-394, 253 S.E.2d 114, 129-130 (W.Va. 1978) (escrow protective orders are not favored but are permitted in limited circumstances upon the landlord's motion and a hearing, wherein the landlord must show an obvious need for protection and must be balanced against the apparent merits of the tenant's defense).

To be sure, this Court is not attempting to alter the elements of or relax the strict standards necessary to successfully maintain a defense or counterclaim of a breach of the implied warranty of habitability. To successfully maintain a cause of action for breach of

the implied warranty of habitability, the tenant must prove: (1) entry into a lease for residential property; (2) the development of a dangerous or unsanitary condition materially affecting the *life, health, and safety* of the tenant; (3) reasonable notice of the defect to the landlord; and (4) the landlord's failure to restore the premises to habitability. Detling, 671 S.W.2d at 270. Instead, we hold a tenant's submission of the entire contracted-for rent to the court *in custodia legis* is not an automatic prerequisite to a tenant raising the landlord's breach of the warranty as a defense or counterclaim in a rent and possession suit against her. We join the majority of other jurisdictions that have examined and adopted the implied warranty of habitability over the last four decades and hold that the trial court *may* order a tenant in possession to submit all, part, or none of her withheld rent to the court *in custodia legis* pending litigation. Because the trial court is in the best position to assess the merits of the case and the parties' respective positions and competing interests, the trial court shall have the discretion to enter a suitable protective order upon either party's request and after notice and an opportunity to be heard by the opposing party.

## Conclusion

Based on the foregoing, we would grant Appellant's Points I and II, reverse the trial court's judgment, and remand the cause to the trial court for the court's consideration of Appellant's affirmative defense and counterclaim based on the implied warranty of habitability. However, due to the general interest and importance of the issue on appeal, we transfer to the Missouri Supreme Court pursuant to Rule 83.02.

19

_____
SHERRI B. SULLIVAN, P.J.

Roy L. Richter, J., and
Colleen Dolan, J., concur