OPINION OF THE COURT
Joseph Kevin McKay, J.
INTRODUCTION
These 31 nonpayment proceedings were instituted in June, 1983 by petitioner landlord in the face of an ongoing rent strike by tenants respondents started in March, 1983. Respondents all counterclaimed for breach of the warranty *737 of habitability and for rent reductions on account of a lack of hotel services. Actions and counteractions were also filed in State Supreme Court by both sides for similar and additional declaratory relief, but no stay of these proceedings was ever sought or granted. In fact, both sides affirmatively urged this court to try all of these nonpayment actions jointly and as expeditiously as possible notwithstanding the pendency of the Supreme Court actions. Under these exigent circumstances, this court acceded to the request of the parties and, after joint trials, decides the nonpayment questions presented.
The essential issues common to all these casés were reduced to two:
(1) How much abatement, if any, are all these tenants entitled to for having lived with extensive renovation of the common areas in the building from the beginning of their tenancies in the summer of 1982 until the end of March, 1983?
(2) What consequences result, if any, from the petitioner’s failure to provide most of the traditional hotel services to these new tenants while petitioner is admittedly a member of the Metropolitan Hotel Industry Stabilization Association (METHISA) and is governed by its new code, dated July 15, 1982, and effective on July 23, 1982?
ABATEMENT FOR COMMON AREA DISREPAIR
As for the first issue, the state of disrepair of common areas can certainly be a basis for at least partial abatements. In these cases, petitioner argued there should be no abatement because each of the tenants knew about the ongoing renovation at the beginning of his or her tenancy. The respondents press their rights to abatements by claiming that some were initially promised that the renovations would be finished within a month or two and that the protracted unfinished character of the common areas seriously interfered with their occupation of the premises.
It is uncontroverted on this trial record that the lobby, the hallways, the stairs and stairwells, and the basement laundry room were all in various states of disrepair and in the midst of substantial renovation from the summer of 1982 (when most of the tenants signed their leases) until *738 the end of March, 1983. Elevator service was also substantially curtailed during this period. There was only one freight elevator working, which was operated manually by a building employee. It served as the only elevator facility for the 187 units in this 15-story building until two new automatic elevators became operational sometime in early April, 1983. Finally, garbage disposal was less than satisfactory for part of this period until the new compactor was installed. Building materials, scaffolding, bare walls and ceilings, dangling light bulbs, exposed wires, and scattered dirt and debris made those common areas of the building unclean, to some extent unsafe (particularly the stairs and stairwells) and unsightly. This also affected tenants’ own apartment units in that dirt from the hallways was often unavoidably tracked inside apartments.
Faced with this record, the petitioner presented an unimpressive rebuttal by calling a few tenants who moved into their apartments several months later than most of the respondents to say that things were fine in the building as far as they were concerned. Petitioner also called some of the hotel employees to deny that they had made any promises to respondents that the renovation would be completed within a specific time frame. However, petitioner failed to call a senior officer of the owner corporation, the father of the corporate officer who was present throughout the trial and who testified, which senior officer was the one, according to some respondents’ credible testimony, who promised completion within a month or two. I, therefore, accept respondents’ version of these conversations and find that such promises led respondents reasonably to expect that they would not have to live with these conditions for an extended period. Such predictions or representations, taken together with the protracted renovation period and a lack of sufficient explanation as to why the work took so long,[1] lead this court to conclude that the warranty of habitability was indeed breached in these cases.[2] (See Park West Mgt. Corp. v Mitchell, 47 NY2d 316, *739 cert den 444 US 992; Mantica R Corp. NV v Malone, 106 Misc 2d 953; 111 East 88th Partners v Simon, 106 Misc 2d 693.)
Having established the aforesaid conditions at trial, respondents’ attorney requested in closing argument that his clients receive 15% monthly abatements up to January, 1983 and thereafter 10% through March 31, 1983. Petitioner’s counsel, on the other hand, argued that there should be no abatements for common area renovations, but if they were to be granted they should not exceed 10%. Based in part on counsels’ own estimates as well as the court’s own assessment of the situation in the building from photo exhibits and the testimony (or stipulations in lieu of testimony) of all the tenant respondents, the court concludes that the diminution in the value of these rentals was an average of 10% throughout this renovation period. The court further holds, however, that the 10% monthly abatement should not be applied to the first month of each tenancy in recognition of the fact that all the tenants observed the renovation in progress and at least implicitly agreed to live with those conditions for that initial monthly period. Therefore, these 10% abatements all begin to run from the beginning of each tenant’s second month in occupancy until March 31, 1983.
HOTEL SERVICES
The second issue common to all respondents concerns hotel services under the new Code of the Metropolitan Hotel Industry Stabilization Association, Inc. (Code) which became effective on July 23,1982. Only one other reported decision has been found on this subject since the new Code has been in effect, Brewster v Gavins (117 Misc 2d 952), which is not regarded as dispositive of the issue of which hotel services, if any, are mandated by the new Code.[3] The Conciliation and Appeals Board (CAB), the principal administrative agency authorized to hear cases under the Code, has not yet decided what hotel services are required under the new Code.
*740 This case, therefore, presents an issue important to both sides and is regarded by them as one of first impression. In view of the fact that all respondents have been withholding all of their rent for several months to date, and considering the sense of urgency conveyed to this court by both sides for a speedy trial and decision in all of these nonpayment summary proceedings, this court would be hard pressed to defer a decision pending action by the CAB. (Compare Saljen Realty Corp. v Human Resources Admin., 115 Misc 2d 553 [App Term, 1st Dept].) Nevertheless, the court is deciding these cases without prejudice to what the CAB may rule hereafter upon the proper application of any appropriate party for reclassification of the building and to set proper rents. (See Rent Stabilization Law of 1969, L 1983, ch 403, § 43, Administrative Code of City of New York, § YY51-3.1, subd b, as amd June 26, 1983.)
Factually, the trial established that petitioner is currently providing to respondents the following services: desk service, including some mail service, some rough equivalent of bellboy services performed by one or two lobby attendants and minimal telephone service. New carpeting has also been provided to all respondents, but not upkeep of the carpeting. The parties stipulated that these services constitute 20% of all the hotel services set forth in the METHISA Code (although the list in the Code does not purport to be exhaustive). The remaining 80%, which are services not provided by petitioner to respondents, are “maid service, furnishings and laundering of linen * * * and use and upkeep of furniture and fixtures.” (Code, § 3, subd [h].)
The stipulation just referred to above also included an estimate of the relative value of the hotel services in relation to the respondents’ rent. The stipulation reads in full as follows:
“1. That if all hotel services set forth in the Metropolitan Hotel Industry Stabilization Code were given to the respondent-tenants herein said services would constitute 25% of the rent charged for each of the respondents’ apartments.
“2. It is conceded and stipulated that the petitioner-landlord is providing only 5% of the services and that the *741 services that are not being provided to the respondents would comprise 20% of the rent being charged.
“3. This stipulation is in lieu of expert testimony and without prejudice to landlord’s claim that it does not have to provide hotel services to the respondent-tenants herein.”
It should be emphasized here that consistent with all the petitions and as recognized and conceded by petitioner at trial, with no opposition from respondents’ counsel, petitioner is a member of METHISA, and all of the units in question are currently governed by the METHISA Code. However, it is also apparent to this court that petitioner has been undergoing a serious “identity crisis” as to whether in its newly renovated condition it should be, or even wants to continue to be, part of METHISA.[4] For example, it advertised these newly renovated units as apartments, not as hotel rooms or suites, and it used the rent-stabilized lease form and tenants’ rights riders without reference to hotel stabilization or METHISA for each of respondents’ leases.[5] Furthermore, petitioner offered one- and two-year leases, instead of six-month ones. Thus, with the exception of the name of the owner, “Whitehall Hotel Corp.” and article 42 of the leases concerning the purported waiver of “hotel services” — to be discussed below — there is not a single reference in these multipage leases to the fact that this building is a hotel or that the lessees are supposed to be hotel tenants.[6]
Although these facts and circumstances demonstrate the ambivalent attitude of petitioner toward METHISA, these units are still currently under the METHISA Code and this *742 court will not attempt to affect or alter this classification in the context of these nonpayment summary proceedings. (See Rent Stabilization Law of 1969, Administrative Code, § YY51-3.1, as amd June 26, 1983.)
With respect to the waiver clause, article 42 of the leases[7] referred to above, if the court were to find a valid, enforceable waiver here by each of the tenants, such a finding would seem to dispose of the “hotel services” issue in favor of petitioner. This would require a careful analysis of the Code because section 7 of the new Code declares certain waivers to be void. It reads as follows: “waiver of benefit void. Any agreement by a tenant to waive the benefit of any provision of the RSL, the ETPA, or this Code shall be void, unless permitted by this Code.”
Accordingly, the waiver clause in each of the leases is void if the hotel services purportedly waived comprise (1) benefits provided for in the METHISA Code or the enabling statute, the Rent Stabilization Law of 1969, and (2) the waiver of such benefit is not otherwise permitted by the METHISA Code. Of course, the same careful analysis of the Code would be required to determine whether petitioner has violated the statute or the Code in the first place, apart from the validity of any waiver. We turn therefore to the analysis of the new Code.
The first reference in the Code to “hotel services” is found in subdivision (h) of section 3, “definitions”. That subdivision reads in full as follows: “Section 3. definitions * * * (h) ‘Hotel’ — Any Class A or Class B Multiple Dwelling containing six or more dwelling units which on June 1, 1968 was and still is commonly regarded as a hotel, transient hotel or residential hotel, which customarily provides hotel services such as maid service, furnishings and laundering of linen, telephone and bellboy service, secretarial or desk service and use and upkeep of furniture and fixtures.”
It should be noted here that one of the differences in this amended Code from its predecessor is found right in the definition of hotel. The prior Code included the words, *743 “provides or makes available hotel services such as”, while the new Code eliminates the words “or makes available”. This change made the Code definition identical with a definition of “hotel” in the statute itself, the Rent Stabilization Law of 1969 (Administrative Code, § YY51-3.0, subd a, par [1], cl [e]), except that this particular statutory definition in the Rent Stabilization Law of 1969 refers only to class A multiple dwellings. The Commissioner of the Department of Housing Preservation and Development (DHPD) in his explanatory statement to this new Code labels this difference as one of the “more significant changes,” which “requires the owner to actually provide customary hotel services instead of merely claiming that they are available in order to take advantage of the benefits under the Code”. Since the commissioner’s comment relates only to the definition section, it must be understood to refer to a threshhold classification issue, that is, whether the building is properly a hotel in the first place, an issue concerning which this court defers to the CAB as more fully explained below, and not necessarily, as urged by respondents, to mean that the definition section by itself automatically confers any additional benefits on these tenants respondents. In any event, to the extent that this explanatory statement does intend to express the latter interpretation, this court declines to follow it. (See, generally, 56 NY Jur, Statutes, § 179.)
Without exception, every other reference in the Code to “services”[8] speaks exclusively in- terms of services which were furnished or required to be furnished as of a certain date. In all cases, the controlling date is the date of the initial commencement of a given tenancy where such commencement is later than the base dates of May 31, 1968, May 29, 1974 or July 1, 1974 (see Code, § 3, subd [p]). Any decrease in such required services is strictly regulated by the Code and the CAB. (See Code, § 42.) However, nowhere in this new Code is it specified which particular hotel services, if any, are required. Moreover, the official rider for hotel tenants subsequently approved by DHPD for *744 attachment to hotel-stabilized leases repeats the admonition of the Code that services provided or required on the date occupancy commences (or, if later, on the date the unit first became subject to rent stabilization) may not be decreased. This official rider then goes on to state: “Required services include buildingwide services such as heat, hot water, janitorial service, maintenance of locks and security devices, repair and maintenance and may include elevators, air conditioning, doorman and other amenities[9] * * * Required services may also include services within the dwelling unit, such as maintenance and repair of appliances, cleaning, linens and painting every three years.”
It is understood that the rider quoted above was published for informational purposes only and does not become part of any lease, nor does it replace or modify the Rent Stabilization Law of 1969 or the Code. Nevertheless, the rider underscores the ambiguity which permeates the Code itself with respect to required hotel services, or put more positively, it demonstrates the studied decision of the drafters of the Code to refrain from specifying which particular hotel services would be required.
It is therefore apparent to this court that the free-market bargaining approach for the setting of agreed rents and services at the commencement of new tenancies, which has been traditionally employed in hotel stabilization, remains essentially intact under the new Code. The Code continues to provide for strict regulation of the increase or decrease in services from the base date, which for new tenants is the commencement of their tenancy.
The threshold issue of what minimal hotel services, if any, or what minimum percentage of hotel services are mandated for this and other buildings to fit the definition of “hotel” under the new Code, will have to be left to the CAB. Deference to the CAB on this issue is appropriate for a number of sound administrative and judicial reasons, including the circumstance that the “hotel status” of the building within METHISA was not seriously disputed or *745 litigated before this court. (See Saljen Realty Corp. v Human Resources Admin., 115 Misc 2d 553, supra.) The CAB has more flexibility to inquire into the issue both from a historical and current perspective and to fashion appropriate remedies, if necessary. Now, however, it is all the more necessary to defer to the CAB on this issue in view of a very recent amendment of the housing laws, section 43 of chapter 403 of the Laws of 1983, amending the Rent Stabilization Law of 1969 (Administrative Code, § YY51-3.1, eff June 26, 1983) cited previously. By that amendment the Legislature has directed it shall henceforth be the business of the CAB to determine upon application of a tenant or owner, “if such building is a hotel covered by this law, based upon the services provided and other relevant factors.” (Rent Stabilization Law of 1969, Administrative Code, § YY51-3.1, subd b.)
Based on the foregoing analysis, this court holds that the current METHISA Code does not require this petitioner to furnish any one or more specific hotel services to these respondents other than those few services already being provided.
In view of this conclusion it follows that section 7 of the Code (“waiver of benefit void”) does not apply to or render void the waiver of hotel services signed by these respondents. These tenants can and did agree to forego receiving the traditional hotel services, signified in part by the waiver clause (art 42) in each of the leases, and by their over-all agreement to pay the specified rents without these services. This may be contrary to the spirit of the new METHISA Code, but not to its letter, as read by this court. Hence, no reductions in rent are warranted at this time on account of the lack of those services. To reiterate, however, this ruling is without prejudice to what the CAB may hereafter order if application is made for reclassification and the fixing of rents.
This is not an unjust or inequitable result. Not one of these tenant respondents ever even remotely suggested at trial that he or she wanted or expected these additional hotel services at the outset of his tenancy, nor is there any evidence that any of these tenants made inquiries or re *746 quests of the landlord about these services.[10] What they sought at trial, instead, were rent reductions. Clearly, they all had agreed to the rent fixed in their leases knowing full well that the rent did not include these services. Moreover, I credit the proof offered by petitioner that the rents would have been set significantly higher if these traditional hotel services were to have been provided and included, especially considering the fact that all utilities were already included in these rents.
ABATEMENT ISSUES UNIQUE TO CERTAIN TENANTS
In addition to the two principal common issues determined in this opinion, there were several abatement issues raised by individual tenants at trial which were unique to their own dwelling units. Many fall into, the same category and were occasioned by failure of petitioner to have some of these units finished and ready for occupancy on the previously agreed upon first date of the lease. Aside from relatively minor problems about finishing touches, which are deemed mere inconveniences, the chief complaints from certain tenants were that their kitchens, including delayed installation of major fixtures and appliances, and in some cases the bathrooms, were substantially unfinished and rendered the dwelling units substantially uninhabitable for varying periods of time. At the close of the trial, petitioner’s attorney conceded that in the extreme cases a complete abatement should be granted to the respondents involved for the duration of their individual unit’s problem. Accordingly, the court finds from the evidence at trial that the following respondents and their cotenants, endured substantial renovation problems at the commencement of their tenancies for the periods noted next to their names and are entitled to 100% abatement of rent for those periods, except where a lesser per cent is indicated for conditions deemed less serious:
*747 1. T. Brooks (apartment 909) 2 days
2. P. Wang (apartment 808) 1 week
3. D. Crom (apartment 216) 2 weeks
4. P. Kubey (apartment 700) 2 days
5. E. Murray (apartment 807) 1 week
6. K. Nelson (apartment 421) 2 days
7. C. Dietzel (apartment 1102) 1 week
8. D. Gormley (apartment 1104) 1 week (unless already credited by petitioner)
9. R. Cunningham (apartment 707) 10 days at 50%
10. M. Bush (apartment 914) 1 week at 50%
In addition to these early move-in problems, some respondents testified, without contradiction, to relatively serious problems which occurred in their individual dwelling units at one time or another during their tenancies, for which they seek additional abatements. With respect to those matters the court makes the following findings and conclusions, as detailed in the table below:
Tenant/Unit
1. P. Wang/apartment 909
2. L. Kadyk/apartment 1400
3. D. Cron/apartment 216
4. S. Feldman/apartment 1100
5. P. Kubey/apartment 70C )
6. C. Gittleman/apartment 902
Condition
Unsafe condition, leaky gas stove
Unsafe condition, broken ignition in stove
Especially bad rodent problem
Intermittent lack of hot water
Intermittent lack of hot water-
Bad leak, ripped-out and crumbled walls
Part of ceiling caved in
n Percentage of Abatement
10%
10%
5%
5%
5%
50%
50%
Duration
5 months
lVz months
6 months
60 days (2 months)
30 days (1 month)
2 weeks
1 week
attorney’s fees
The final issue for this court to decide in these cases concerns awards of attorney’s fees. Because both sides *748 achieved partial, but significant success, and in view of the attorney’s fees clause (par 20) in the leases, reasonable counsel fees will be awarded to both sides.[11]
With the court’s approval, both sides agreed to offer proof of their legal services by affidavits which the court has reviewed carefully. The court also notes that the cases involved a highly specialized area of landlord-tenant law. Moreover, the trial consisted of several full days of testimony, and the court received 107 exhibits into evidence. Finally, the court acknowledges the exemplary degree of co-operation shown by counsel who entered into numerous time-saving stipulations on matters which in their judgment did not jeopardize their respective clients’ interests.
Excluding time spent on the Supreme Court action, the court finds from the affidavit of petitioner’s attorney that he spent approximately 135 hours working on these proceedings. Given that the primary specialty of petitioner’s attorney is labor law and not landlord-tenant law, for purposes of this award his hourly rate will be reduced from $150 to $75, which amounts to an award of $10,125.
Respondents’ attorney’s affidavit shows that after discounting the time attributable to the Supreme Court action he and his firm spent 36 hours out of court and 41.5 hours in court. Respondents’ attorney’s hourly rates for this case were $100 for out-of-court time and $125 in court. Given the economies gained from the volume and specialized nature of respondents’ attorney’s practice, these rates will be allowed. This means that counsel fees for respondents are awarded in the total amount of $8,787.50.
CONCLUSION
The amounts of rent outstanding for each unit leased by respondents were stipulated to at trial and are set forth in exhibits 1A through 31 A. From each sum the appropriate rent abatements must be deducted in accordance with the formulas set forth in this opinion, and petitioner will be granted judgment for the balance due from each respondent.
*749 With respect to the classification of this building as a hotel under the METHISA Code, the court will not disturb petitioner’s present classification as a hotel for purposes of these nonpayment proceedings, but this is without prejudice to whatever appropriate decision and action the CAB may take upon application of the owner or any of the tenants for reclassification and the fixing of rents.
With respect to the hotel services themselves, the court has determined that under the circumstances of these cases no additional services are mandated under the new METHISA Code and no rent abatements are warranted on account of petitioner’s failure to provide most of the traditional hotel services to these respondents. This finding is also without prejudice to what the CAB may hereafter order.

. It is noted here that not until the tenants organized and began to withhold their rent in March, 1983 did petitioner seem to hurry to effect substantial completion of this part of the renovation. It seems likely that petitioner may have found it more economically advantageous to complete the renovation of new dwelling units ahead of the common areas, at least until March, 1983, to the detriment of the tenants already in the building.

. It is noteworthy that the warranty of habitability implied by operation of section 235-b of the Real Property Law is actually incorporated and expressed in article 8 of the leases of all respondents, wherein it is stated that “Owner agrees that the apartment and *739 the building are fit for human habitation and that there will be no conditions which will be detrimental to life, health or safety.”

. In Brewster v Gavin (117 Misc 2d 952), the court observed in what could be considered dicta, that the building there in question, notwithstanding its registration under the METHISA Code, was not a “hotel” because to be so it must customarily provide hotel services such as maid service, etc., and none of these services was provided. For other reasons this finding was not necessary to the ultimate result in the case which was that petitioner in Brewster could not recover respondent’s unit for her own use.

. This identity question appears to extend to the class of the dwelling units themselves under the Building Code. Prerenovation they were classified as class B units and they continue to bear the same class B status now notwithstanding the renovation which included installation of interior bathrooms and kitchens in each unit and despite the fact that one- or two-year leases were offered for all the units.

. The new lease rider for hotel-stabilized tenants, approved by the Department of Housing Preservation and Development, is dated March, 1983 and was presumably not available at the commencement of respondents’ tenancies. Nevertheless, section 27 of the new Code of the Metropolitan Hotel Industry Stabilization Association, Inc. (Code) clearly requires a tenant’s rights form to be furnished, signed and kept on file, which petitioner failed to do.

. A further example of petitioner’s “identity crisis” is its filing of a J51 tax abatement application which, if granted and accepted, would seem to require petitioner to continue under hotel stabilization. (Rent Stabilization Law of 1969, L 1983, ch 403, § 43, Administrative Code of City of New York, § YY51-3.1.)

. Article 42 of the leases provides as follows: “Tenant acknowledges that the landlord has advised her that hotel services are available, but the tenant hereby refuses same since such hotel services would result in an additional charge and tenant prefers to save the cost of such service.”

. The remaining references to services in the new Code are found in subdivision (p) of section 3 (definition of “ ‘required services’ ”), section 41 (“increase in services”), section 42 (“decrease in services”), and section 60 (“evasion of code”).

. This statement of required services tracks closely the language of subdivision (m) of section 2 of the Code of the Rent Stabilization Association of New York City, Inc., as amended April 2, 1979.

. Of course, it is quite conceivable that if the hotel tenant’s rights riders had been furnished, inquiries about hotel services would have been stimulated. Nevertheless, I find no cognizable damages arising in these actions by virtue of the petitioner’s failure in this regard, although the CAB may weigh this failure if and when reclassification application comes before it.

. Neither costs nor disbursements, however, will be allowed to either side. With respect to disbursements, respondents did not request or offer proof of them and petitioner did not make the proper allocation between expenditures for the Supreme Court actions and those for the instant Civil Court proceedings.