**Clyde WADE, Plaintiff and Appellee,**

**v.**

**Lynda JOBE, Defendant and Appellant.**

**No. 890443.**

Supreme Court of Utah.

Sept. 23, 1991.

---

Judith Mayorga, Ogden, Bruce M. Plenk, Salt Lake City, for defendant and appellant.

James H. Deans, Salt Lake City, for plaintiff and appellee.

DURHAM, Justice:

In June 1988, defendant Lynda Jobe (the tenant) rented a house in Ogden, Utah, from plaintiff Clyde Wade (the landlord). Jobe had three young children. Shortly after she took occupancy, the tenant discovered numerous defects in the dwelling, and within a few days, she had no hot water. Investigation revealed that the flame of the water heater had been extinguished by accumulated sewage and water in the basement which also produced a foul odor throughout the house. The tenant notified the landlord, who came to the premises a number of times, each time pumping the sewage and water from the basement onto the sidewalk and relighting the water heater. These and other problems persisted from July through October 1988.

In November 1988, the tenant notified the landlord that she would withhold rent until the sewage problem was solved permanently. The situation did not improve, and an inspection by the Ogden City In-

spection Division (the division) in December 1988 revealed that the premises were unsafe for human occupancy due to the lack of a sewer connection and other problems. Within a few weeks, the division made another inspection, finding numerous code violations which were a substantial hazard to the health and safety of the occupants. The division issued a notice that the property would be condemned if the violations were not remedied.

After the tenant moved out of the house, the landlord brought suit in the second circuit court to recover the unpaid rent. The tenant filed a counterclaim, seeking an offset against rent owed because of the uninhabitable condition of the premises and seeking damages, attorney fees, and declaratory relief under the Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1 to -23. The tenant also moved for removal to the district court pursuant to Utah Code Ann. § 13-11-6. The motion was granted.[1]

At trial, the landlord was awarded judgment of unpaid rent of $770, the full rent due under the parties' original agreement. The tenant was denied any offsets, and her counterclaim was dismissed, the court holding that the Utah Consumer Sales Practices Act did not apply to landlord/tenant transactions and, if it did, the landlord had not engaged in any deceptive act. This appeal followed, raising two issues: First, may a tenant recover at common law for breach of a warranty of habitability? Second, does the Utah Consumer Sales Practices Act apply to residential rental transactions, and if the Act is applicable, did the landlord in this case commit an unconscionable or deceptive act in violation of it?

The discussion concerning the warranty of habitability contained in the first section of this opinion reflects the unanimous view of the members of this court. The second section, discussing whether the renting of residential housing is a consumer transaction within the meaning of the Utah Consumer Sales Practices Act (UCSPA), re-

flects only the view of the author and Justice Zimmerman. The remaining members of the court do not consider it necessary in this case to reach this question because of the likelihood that defendant will receive adequate relief on her counterclaims under the warranty of habitability doctrine, as explained in Justice Howe's separate opinion. They may or may not prove to be right, but I include my views on the UCSPA for the benefit of the trial court and the bar nonetheless. *See* Utah R.App.P. 30(a); *Hiltsley v. Ryder*, 738 P.2d 1024, 1026 (Utah 1987) (Zimmerman, J., concurring).

## I. WARRANTY OF HABITABILITY

At common law, the leasing of real property was viewed primarily as a conveyance of land for a term, and the law of property was applied to landlord/tenant transactions. At a time when the typical lease was for agricultural purposes, it was assumed that the land, rather than any improvements, was the most important part of the leasehold. *See generally* 2 R. Powell, *The Law of Real Property* ¶ 221[1], at 16-7 to -9, ¶ 233, at 16B-39 to -40 (1991); *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1077 (D.C.Cir.), *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970). Under the rule of caveat emptor, a tenant had a duty to inspect the premises to determine their safety and suitability for the purposes for which they were leased before entering a lease. Moreover, absent deceit or fraud on the part of the landlord or an express warranty to the contrary, the landlord had no duty to make repairs during the course of the tenancy. *See Jespersen v. Deseret News Publishing Co.*, 119 Utah 235, 225 P.2d 1050, 1053 (1951). Under the law of waste, it was the tenant's implied duty to make most repairs. *See Cluff v. Culmer*, 556 P.2d 498, 499 (Utah 1976).

Unlike tenants in feudal England, most modern tenants bargain for the use of structures on the land rather than the land itself. *See Williams v. Melby*, 699 P.2d

---

1. A default judgment against the landlord on the tenant's counterclaim was entered by the district court on June 1, 1989, in the amount of $2,672. The default judgment was set aside pursuant to a stipulation of the parties.

723, 727 (Utah 1985). Modern tenants generally lack the necessary skills or means to inspect the property effectively or to make repairs. *Javins,* 428 F.2d at 1078–79. Moreover, the rule of caveat emptor assumes an equal bargaining position between landlord and tenant. Modern tenants, like consumers of goods, however, frequently have no choice but to rely on the landlord to provide a habitable dwelling. *See Javins,* 428 F.2d at 1079. Where they exist, housing shortages, standardized leases, and racial and class discrimination place today's tenants, as consumers of housing, in a poor position to bargain effectively for express warranties and covenants requiring landlords to lease and maintain safe and sanitary housing. *Javins,* 428 F.2d at 1079; *Green v. Superior Court,* 10 Cal.3d 616, 111 Cal.Rptr. 704, 709, 517 P.2d 1168, 1173 (1974).

 In consumer law, implied warranties are designed to protect ordinary consumers who do not have the knowledge, capacity, or opportunity to ensure that goods which they are buying are in safe condition. *See Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69, 78 (1960); Utah Code Ann. §§ 70A–2–314 to –316 (implied warranties contained in Uniform Commercial Code). The implied warranty of habitability has been adopted in other jurisdictions to protect the tenant as the party in the less advantageous bargaining position.

 The concept of a warranty of habitability is in harmony with the widespread enactment of housing and building codes which reflect a legislative desire to ensure decent housing. *See Hall v. Warren,* 632 P.2d 848, 850 (Utah 1981). It is based on the theory that the residential landlord warrants that the leased premises are habitable at the outset of the lease term and will remain so during the course of the tenancy. *See Javins,* 428 F.2d at 1081. The warranty applies to written and oral leases, *see Javins,* 428 F.2d at 1077 n. 29, and to single-family as well as to multiple-unit dwellings. The warranty of habitability has been adopted, either legislatively or judicially, in over forty states and the Dis-

trict of Columbia. *See* 2 R. Powell, *The Law of Real Property* ¶ 233[2], at 16B–50 to –51 n. 42 (cases), ¶ 233[3], at 16B–64 (statutes) (1991).

 In recent years, this court has conformed the common law in this state to contemporary conditions by rejecting the strict application of traditional property law to residential leases, recognizing that it is often more appropriate to apply contract law. *See Reid v. Mutual of Omaha Ins. Co.,* 776 P.2d 896, 902 n. 3 (Utah 1989); *Williams v. Melby,* 699 P.2d at 726–27; *Hall v. Warren,* 632 P.2d at 850. Similarly, we have expanded landlord liability in tort. *See Williams; Hall; Stephenson v. Warner,* 581 P.2d 567 (Utah 1978) (landlord must use ordinary care to ensure leased premises are reasonably safe). Consistent with prevailing trends in consumer law, products liability law, and the law of torts, we reject the rule of caveat emptor and recognize the common law implied warranty of habitability in residential[2] leases.

 The determination of whether a dwelling is habitable depends on the individual facts of each case. To guide the trial court in determining whether there is a breach of the warranty of habitability, we describe some general standards that the landlord is required to satisfy. We note initially that the warranty of habitability does not require the landlord to maintain the premises in perfect condition at all times, nor does it preclude minor housing code violations or other defects. Moreover, the landlord will not be liable for defects caused by the tenant. *See Javins,* 428 F.2d at 1082 n. 62; *Hinson v. Delis,* 26 Cal. App.3d 62, 102 Cal.Rptr. 661 (1972); *Marini v. Ireland,* 56 N.J. 130, 265 A.2d 526 (1970). Further, the landlord must have a reasonable time to repair material defects before a breach can be established.

 As a general rule, the warranty of habitability requires that the landlord maintain "bare living requirements," *see Academy Spires, Inc. v. Brown,* 111 N.J.Super. 477, 268 A.2d 556, 559 (1970),

---

**2.** We do not decide whether the warranty is implied in commercial leases.

and that the premises are fit for human occupation. *See Mease v. Fox*, 200 N.W.2d 791 (Iowa 1972); *Hilder v. St. Peter*, 144 Vt. 150, 478 A.2d 202, 208 (1984). Failure to supply heat or hot water, for example, breaches the warranty. A breach is not shown, however, by evidence of minor deficiencies such as the malfunction of venetian blinds, minor water leaks or wall cracks, or a need for paint. *See Academy Spires, Inc. v. Brown*, 268 A.2d at 559.

■■■■ Substantial compliance with building and housing code standards will generally serve as evidence of the fulfillment of a landlord's duty to provide habitable premises. Evidence of violations involving health or safety, by contrast, will often sustain a tenant's claim for relief. *See Green v. Superior Court*, 517 P.2d at 1182–83. At the same time, just because the housing code provides a basis for implication of the warranty, a code violation is not necessary to establish a breach so long as the claimed defect has an impact on the health or safety of the tenant. *Hilder v. St. Peter*, 478 A.2d at 209.

In the instant case, in support of her claim that the premises were not in habitable condition, the tenant presented two city housing inspection reports detailing numerous code violations which were, in the words of the trial judge, "a substantial hazard to the health and safety of the occupants." Those violations included the presence of raw sewage on the sidewalks and stagnant water in the basement, creating a foul odor. At trial, the tenant testified that she had repeatedly informed the landlord of the problem with the sewer connection and the resulting lack of hot water, but the landlord never did any more than temporarily alleviate the problem. The landlord did not controvert the evidence of substantial problems. At trial, the court granted judgment for the landlord, concluding that Utah law did not recognize an implied warranty of habitability

for residential rental premises. As discussed above, we have now recognized the warranty. We therefore remand this case to the trial court to determine whether the landlord has breached the implied warranty of habitability as defined in this opinion. If the trial court finds a breach of the warranty of habitability, it must then determine damages.

### A. Remedies

■■■■ Under traditional property law, a lessee's covenant to pay rent was viewed as independent of any covenants on the part of the landlord. *See General Ins. Co. of America v. Christiansen Furniture Co.*, 119 Utah 470, 229 P.2d 298 (1951); *Jespersen v. Deseret News Publishing Co.*, 119 Utah 235, 225 P.2d 1050 (1951). Even when a lessor expressly covenanted to make repairs, the lessor's breach did not justify the lessee's withholding rent. Under the prevailing contemporary view of the residential lease as a contractual transaction, however, *see Javins*, 428 F.2d at 1075, the tenant's obligation to pay rent is conditioned upon the landlord's fulfilling his part of the bargain. The payment of rent by the tenant and the landlord's duty to provide habitable premises are, as a result, dependent covenants.

■■■■ Once the landlord has breached his duty to provide habitable conditions, there are at least two ways the tenant can treat the duty to pay rent. The tenant may continue to pay rent to the landlord or withhold the rent.[3] If the tenant continues to pay full rent to the landlord during the period of uninhabitability, the tenant can bring an affirmative action to establish the breach and receive a reimbursement for excess rents paid. Rent withholding, on the other hand, deprives the landlord of the rent due during the default, thereby motivating the landlord to repair the premises. *See* 2 R. Powell, *The Law of Real Property* ¶ 228[6][d], at 16A–51 (1990).[4]

**3.** In addition, some jurisdictions recognize rent application, also known as "repair and deduct," allowing the tenant to use the rent money to repair the premises. Because this remedy has not been relied on or sought in the instant case,

we do not at this time make a ruling on its availability in Utah.

**4.** The majority of jurisdictions that permit rent withholding allow the tenant to retain the funds subject to the discretionary power of the court

■ Some jurisdictions have taken the position that the tenant is entitled to an abatement only against the withheld rent in a rent collection case, holding that damages for the uninhabitable conditions existing prior to the tenant's withholding must be recovered in a separate action. *See C.F. Seabrook Co. v. Beck*, 174 N.J.Super. 577, 417 A.2d 89 (1980). We reject this reasoning; it is more in keeping with the policy behind our adoption of the warranty of habitability to provide for retroactive abatement of the rent during the period of the landlord's default whether or not the tenant withholds rent.[5]

## B. Damages

■ In general, courts have applied contract remedies when a breach of the warranty of habitability has been shown.[6] One available remedy, therefore, is damages. Special damages may be recovered when, as a foreseeable result of the landlord's breach, the tenant suffers personal injury, property damage, relocation expenses, or other similar injuries. *See Mease v. Fox*, 200 N.W.2d at 797; Restatement (Second) of Property, Landlord & Tenant § 10.2 (1977). General damages recoverable in the form of rent abatement or reimbursement to the tenant are more difficult to calculate.

Several different measures for determining the amount of rent abatement to which a tenant is entitled have been used by the courts. The first of these is the fair rental value of the premises as warranted less their fair rental value in the unrepaired condition.[7] Under this approach, the contract rent may be considered as evidence of the value of the premises as warranted.[8] Another measure is the contract rent less the fair rental value of the premises in the unrepaired condition.[9] Methodological difficulties inherent in both of these measures,[10] combined with the practical difficulties of producing evidence on fair mar-

to order the deposit of the rent into escrow. *See* 2 R. Powell, *The Law of Real Property* ¶ 228[6][d], at 16A–54 (1990). Like the court in *Javins*, we think this type of escrow account would provide a useful protective procedure in the right circumstances. *See Javins*, 428 F.2d at 1083 n. 67.

5. Before the tenant may receive a rent abatement, she must put the landlord in breach by giving her actual or constructive notice of the defects and a reasonable time in which to make repairs. *See Hinson v. Delis*, 26 Cal.App.3d 62, 102 Cal.Rptr. 661 (1972).

6. *See, e.g., Javins*, 428 F.2d at 1073 (breach of warranty of habitability gives rise to all usual contract remedies); *Mease v. Fox*, 200 N.W.2d at 797 (same); *Steele v. Latimer*, 214 Kan. 329, 521 P.2d 304 (1974) (same); *King v. Moorehead*, 495 S.W.2d 65, 75–76 (Mo.Ct.App.1973) (same); *Hilder v. St. Peter*, 478 A.2d at 269 (same); *Teller v. McCoy*, 162 W.Va. 367, 253 S.E.2d 114 (1978) (same).

7. *See, e.g., Green v. Superior Court*, 517 P.2d at 1183; *Glasoe v. Trinkle*, 107 Ill.2d 1, 88 Ill.Dec. 895, 479 N.E.2d 915, 921 (1985); *Roeder v. Nolan*, 321 N.W.2d 1, 5 (Iowa 1982); *Mease v. Fox*, 200 N.W.2d at 797; *Boston Housing Auth. v. Hemingway*, 363 Mass. 184, 293 N.E.2d 831, 845 (1973); *Hilder v. St. Peter*, 478 A.2d at 209; *Teller v. McCoy*, 253 S.E.2d at 128.

8. *See Glasoe v. Trinkle*, 88 Ill.Dec. at 101, 479 N.E.2d at 921; *Darmetko v. Boston Housing* *Auth.*, 378 Mass. 758, 393 N.E.2d 395, 398 n. 4 (1979); *Park West Management Corp. v. Mitchell*, 47 N.Y.2d 316, 418 N.Y.S.2d 310, 317, 391 N.E.2d 1288, 1295, *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *111 East 88th Partners v. Simon*, 106 Misc.2d 693, 434 N.Y.S.2d 886, 888 (Civ.Ct.1980) (absent other evidence, lease rental determines value as warranted); *Gilbert v. District Court*, 67 Or.App. 148, 676 P.2d 917, 918–19 (1984); *Lane v. Kelley*, 57 Or.App. 197, 643 P.2d 1375, 1377, *cert. denied*, 293 Or. 394, 650 P.2d 927 (1982).

9. *See, e.g., Welborn v. Society for the Propagation of the Faith*, 411 N.E.2d 1267, 1271 (Ind. Ct.App.1980); *King v. Moorehead*, 495 S.W.2d at 76; *Kline v. Burns*, 111 N.H. 87, 276 A.2d 248, 252 (1971); *Berzito v. Gambino*, 63 N.J. 460, 308 A.2d 17, 22 (1973); *Park West Management Corp. v. Mitchell*, 391 N.E.2d at 1295; *Bay Park One Co. v. Crosby*, 109 Misc.2d 47, 442 N.Y.S.2d 837, 838 (App. Term 1981); *Lane v. Kelley*, 643 P.2d at 1377; *Beausang v. Bernotas*, 296 Pa.Super. 335, 442 A.2d 796, 799 (1982); *Fair v. Negley*, 257 Pa.Super. 50, 390 A.2d 240, 242 (1978); *Beasley v. Freedman*, 256 Pa.Super. 208, 389 A.2d 1087, 1088 (1978); *Birkenhead v. Coombs*, 143 Vt. 167, 465 A.2d 244, 246 (1983).

10. *See* Smith, *Tenant Remedies for Breach of Habitability; Tort Dimensions of a Contract Concept*, 35 Kan.L.Rev. 505, 518–23 (1987); *Cazares v. Ortiz*, 109 Cal.App.3d Supp. 23, 168 Cal.Rptr. 108 (1980).

ket value,[11] however, limit the efficacy of those measures for dealing with residential leases. For this reason, a number of courts have adopted what is called the "percentage diminution" (or percentage reduction in use) approach which places more discretion with the trier of fact.[12]

Under the percentage diminution approach, the tenant's recovery reflects the percentage by which the tenant's use and enjoyment of the premises has been reduced by the uninhabitable conditions. *See generally* Annotation, *Measure of Damages for Landlord's Breach of Implied Warranty of Habitability,* 1 A.L.R.4th 1182 (1980). In applying this approach, the trial court must carefully review the materiality of the particular defects and the length of time such defects have existed.[13] *See Academy Spires, Inc. v. Brown,* 268 A.2d at 562. It is true that the percentage diminution approach requires the trier of fact to exercise broad discretion and some subjective judgment to determine the degree to which the defective conditions have diminished the habitability of the premises. It should be noted, however, that despite their theoretical appeal, the other approaches are not objectively precise either.[14] Furthermore, they involve the use of an expert witness's subjective opinion of the "worth" of habitable and uninhabitable premises.

■ As the foregoing discussion demonstrates, the determination of appropriate damages in cases of a breach of the warranty of habitability will often be a difficult task. None of the approaches described above is inherently illegitimate, but we think that the percentage diminution approach has a practical advantage in that it will generally obviate the need for expert testimony and reduce the cost and complexity of enforcing the warranty of habitability. We acknowledge the limitation of the method but conclude that it is as sound in its result as any other and more workable in practice. We will have to depend on development of the rule in specific cases to determine whether it will be universally applicable.

## II. CONSUMER SALES PRACTICES ACT

### A. Applicability

■ The Utah Consumer Sales Practices Act (UCSPA), Utah Code Ann. §§ 13–11–1 to –23, prohibits deceptive or uncon-

---

11. Under either approach, at least one market value is almost certain to require expert testimony. The production of such testimony will increase the cost, in time and money, of the typical case.

12. See, e.g., *Cazares v. Ortiz,* 168 Cal.Rptr. at 111, 113; *Winchester Management Corp. v. Staten,* 361 A.2d 187 (D.C.1976); *McKenna v. Begin,* 5 Mass.App.Ct. 304, 362 N.E.2d 548, 552–53 (1977); *Timber Ridge Town House v. Dietz,* 133 N.J.Super. 577, 338 A.2d 21, 24–25 (1975); *Academy Spires, Inc. v. Brown,* 268 A.2d at 561; *Whitehall Hotel v. Gaynor,* 121 Misc.2d 736, 470 N.Y.S.2d 286, 288–89 (Civ.Ct.1983); *Leris Realty Corp. v. Robbins,* 95 Misc.2d 712, 408 N.Y.S.2d 166, 167 (Civ.Ct.1978); *Goldner v. Doknovitch,* 88 Misc.2d 88, 388 N.Y.S.2d 504 (App.Term 1976); *Whitehouse Estates, Inc. v. Thomson,* 87 Misc.2d 813, 386 N.Y.S.2d 733, 734–35 (Civ.Ct. 1976); *Morbeth Realty Corp. v. Rosenshine,* 67 Misc.2d 325, 323 N.Y.S.2d 363, 365–67 (Civ.Ct. 1971); *Pugh v. Holmes,* 253 Pa.Super. 76, 384 A.2d 1234, 1241–42 (1978), *aff'd,* 486 Pa. 272, 405 A.2d 897 (1979). A fourth, hybrid measure, adopted by the Restatement (Second) of Property, uses the ratio of the fair rental value of the unrepaired premises to the fair rental value of the habitable unit as the percentage applied to the agreed rent. Restatement (Second) of Property, Landlord & Tenant § 11.1 (1976). The Restatement approach has been rejected by at least one court as "mind boggling." *See Cazares v. Ortiz,* 168 Cal.Rptr. at 112.

13. These are presumably the same factors considered by an expert in determining fair market values under the other two approaches.

14. For a detailed critique of the assumptions and limitations of all three measures of damage described in this opinion, see Smith, *Tenant Remedies for Breach of Habitability: Tort Dimensions of a Contract Concept,* 35 Kan.L.Rev. 505, 518 (1987). Later in the article, the author argues, "Habitability should be separated into two distinct actions, one a tort action, the other contract, based upon whether the duty to repair the defect is waivable." *Id.* at 547. Nonwaivable duties (regarding risks to health and safety) "certainly [are] not contractual in nature because [their] existence does not stem from the parties' bargain in fact.... Tenant actions based on nonwaivable housing defects should sound in tort and be remedied solely under tort principles." *Id.*

scionable acts or practices by a supplier in connection with a consumer transaction. A consumer transaction is broadly defined as

a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance), to a person for primarily personal, family, or household purposes.... It includes any offer or solicitation, any agreement, any performance of an agreement with respect to any of these transfers or dispositions.

*Id.* at § 13–11–3(2). In addition to excepting securities and insurance in the definition of consumer transaction, section 13–11–22 specifically excepts a number of other acts, practices, persons, and claims from the application of the UCSPA.[15] The Act does not expressly include or exclude residential leases, nor was there any indication in the floor debate prior to the statute's enactment whether the legislature intended to include landlord/tenant transactions within its application.

The UCSPA was modeled after the Uniform Consumer Sales Practices Act, which was drafted by the National Conference of Commissioners on Uniform State Laws in 1971 and approved by the American Bar Association in 1972. The Uniform Consumer Sales Practices Act is the most recent of the model consumer protection statutes, and its application is more narrow than some of the others. D. Pridgen, *Consumer Protection & the Law* § 3.02(2)(e) (1989). It has been adopted in only three states: Utah, Kansas, and Ohio. *Id.*

There is great diversity in the language, scope, degree of enforcement, and judicial interpretation of the various state consumer protection laws. Most relevant here are the differences in the statutory language used to define what is considered to be a "commercial transaction" or "trade or commerce" subject to any given law. The Uniform Consumer Sales Practices Act states that it applies to the "sale, lease, assignment, award by chance, or other disposition of *an item of goods, a service, or an intangible.*" Unif. Consumer Sales Practices Act § 2(1) (emphasis added). Although the language of the model act does not specifically except transactions in real property, the comment to section 2(1) states, "On the assumption that land transactions frequently are, and should be, regulated by specialized legislation, they are excluded altogether" from the scope of the model act. The Utah version of the model act contains no such comment. Moreover, the language of the Utah statute is different, stating that it applies to "goods, services, or other property *both tangible and intangible.*" Utah Code Ann. § 13–11–3(2) (emphasis added). As a general rule, "tangible" property can be either real or personal. *See* 73 C.J.S. *Property* § 15 (1983). The Utah Legislature's addition of the word "tangible" to the language of the definition of consumer transaction is consistent with the conclusion that the Utah act was meant to apply to residential leases and other land transactions.

The UCSPA states that it should be "construed liberally" to promote a number of policies. Utah Code Ann. § 13–11–2. Those policies include making state regulation of consumer sales practices consistent with the policies of the Federal Trade Commission Act, *id.* § 13–11–2(4), and creating uniformity in the law between Utah and the other states enacting similar consumer

---

15. That section specifically states:
 (1) This act does not apply to:
 (a) an act or practice required or specifically permitted by or under federal law, or by or under state law;
 (b) a publisher, broadcaster, printer, or other person engaged in the dissemination of information or the reproduction of printed or pictorial matter so far as the information or matter has been disseminated or reproduced on behalf of others without actual knowledge that it violated this act;

(c) claim for personal injury or death or claim for damage to property other than the property that is the subject of the consumer transaction;
 (d) credit terms of a transaction otherwise subject to this act; or
 (e) any public utility subject to the regulating jurisdiction of the Public Service Commission of the state of Utah.

protection laws. *Id.* § 13–11–2(5). In order to determine the scope of the UCSPA, and specifically, whether it applies to landlord/tenant transactions, therefore, it is instructive to look at the law as it has developed in other jurisdictions.

Defendant cites a number of cases from other states and the federal courts which apply consumer protection laws to residential leases.[16] Most of the consumer protection statutes interpreted in those cases are modeled after the Uniform Trade Practices and Consumer Protection Law, which in turn was patterned after the Federal Trade Commission Act (the F.T.C. Act), 15 U.S.C. §§ 41 to 77. *See* D. Pridgen, *Consumer Protection & the Law* § 3.02[2][c], at 3–6 (1989). That model law and the F.T.C. Act, however, differ from the Uniform Consumer Sales Practices Act and the UCSPA. The statutory definition of "trade and commerce" subject to the former is much broader, expressly including the sale of real property and/or broadly prohibiting all "unfair methods of competition and unfair or deceptive acts or practices." *See id.* This is something the Utah statute does not do.

Notwithstanding this difference, this author and Justice Zimmerman think the Utah consumer protection statute applies to residential leases. The UCSPA specifically includes the "lease" of tangible and intangible property rather than being limited to sales transactions, as the broader acts frequently are. Moreover, that the UCSPA does not expressly mention the leasing of *real property* argues in favor of, rather than against, its application; the legislature has mandated a liberal construction of the Act, and it was explicit in excepting other transactions from its jurisdiction. *See* Utah Code Ann. §§ 13–11–3(2), –22.

The contemporary view of landlord/tenant relations and the public policy behind the consumer protection laws also support the applicability of the UCSPA to residential leasing. Expressing the view adopted by many contemporary authorities, this court wrote:

> When American city dwellers, both rich and poor, seek "shelter" today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.

*Williams v. Melby,* 699 P.2d 723, 727 (Utah 1985) (quoting *Javins v. First Nat'l Realty,* 428 F.2d 1071, 1074 (D.C.Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) (footnote omitted)). Functionally, the tenant, much like a buyer of a used car, is a consumer of housing. *See Commonwealth v. Monumental Properties Inc.,* 459 Pa. 450, 329 A.2d 812, 820–21 (1974), and cases cited therein; Backman, *The Tenant as a Consumer? A Comparison of Developments in Consumer Law and in Landlord/Tenant Law,* 33 Okla.L.Rev. 1 (1980). This court has recognized the similarity between residential leasing and more traditional commercial transactions, stating:

> [M]odern landlord-tenant relationships, while steeped in the tradition of ancient property law, have taken on substantive characteristics so similar to commercial transactions that certain of the legal principles developed in the law of contracts in the context of commercial transactions are now appropriately applied to leases.

*Reid v. Mutual of Omaha Ins. Co.,* 776 P.2d 896, 902 n. 3 (Utah 1989).

---

**16.** *See Carter v. Mueller,* 120 Ill.App.3d 314, 75 Ill.Dec. 776, 782, 457 N.E.2d 1335, 1341 (1983) (citing Ill.Rev.Stat.1981 ch. 121½, ¶ 261)); *McGrath v. Mishara,* 386 Mass. 74, 434 N.E.2d 1215, 1221 (1982) (citing Mass.Gen.Laws Ann. ch. 93A, §§ 1 to 3); *Smolen v. Dahlmann Apartments, Ltd.,* 127 Mich.App. 108, 338 N.W.2d 892, 895–96 (1983) (citing Mich.Comp.Laws § 445,-902; Mich.Stat.Ann. § 19.418(2)); *49 Prospect Street Tenants' Assoc. v. Sheva Gardens, Inc.,* 227 N.J.Super. 449, 547 A.2d 1134, 1141–42 (App.Div.1988) (citing N.J.Stat.Ann. 56:8–2); *Love v. Pressley,* 34 N.C.App. 503, 239 S.E.2d 574, 582–83 (1977) (citing N.C.Gen.Stat. § 75–1.1), *cert. denied,* 294 N.C. 441, 241 S.E.2d 843 (1978); *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812, 820 (1974) (citing 73 Pa.Cons.Stat. § 201–2(3)); *Myers v. Ginsburg,* 735 S.W.2d 600, 605 (Tex.Ct.App.1987) (citing Tex.Bus. & Com.Code Ann. § 17.45).

One of the stated purposes of the UCSPA is "to protect consumers from suppliers who commit deceptive and unconscionable sales practices." Utah Code Ann. § 13–11–2(2). The legislative intent behind the model consumer protection laws was to balance the unequal bargaining positions between supplier and consumer. The tenant is entitled to protection under these remedial laws as much as any other consumer. In view of (1) the legislature's mandate to construe the UCSPA liberally, (2) the stated purpose of keeping Utah law consistent with the F.T.C. Act and the consumer protection laws of other states, and (3) the absence of any language or other expression of legislative intent to the contrary, this author and Justice Zimmerman would hold that the renting of residential housing is a consumer transaction within the meaning of the UCSPA.

### B. Violations of the Act

Section 13–11–4(2) of the UCSPA enumerates several acts which are considered deceptive per se. Under that section, the tenant asserts that the landlord engaged in a deceptive act by indicating that the premises were "of a particular standard, quality, grade, style, or model" when they were not. As a conclusion of law, the trial court found that "the evidence would not warrant a finding of any deceptive act or practice on the part of [the landlord], as contemplated by the Consumer Sales Practices Act."

The UCSPA requires that the supplier act "with intent to deceive." Utah Code Ann. § 13–11–4(2). Implicit in a legal conclusion that there is or is not a deceptive practice or act under the UCSPA is a factual finding that the requisite intent to deceive was either present or absent. The determination of whether a person had the intent is one of fact for the lower court. See Fitzgerald v. Corbett, 793 P.2d 356, 358 (Utah 1990); Hall v. Warren, 632 P.2d 848, 851 (Utah 1981).

A finding of fact can be set aside by this court on appeal only if it is found to be "clearly erroneous." Utah R.Civ.P. 52(a).

A finding is clearly erroneous only if it is against the great weight of evidence or if the court is otherwise definitely and firmly convinced that a mistake has been made. Bountiful v. Riley, 784 P.2d 1174, 1175 (Utah 1989). To challenge a finding of fact, the challenger must marshal all the evidence supporting the finding and then demonstrate that the evidence is legally insufficient to support the finding. See In re Estate of Bartell, 776 P.2d 885, 886 (Utah 1989); Doelle v. Bradley, 784 P.2d 1176, 1178 (Utah 1989). In this case, the tenant has not attempted to marshal the evidence or demonstrate its legal insufficiency. Indeed, there does not appear to be any evidence that the landlord knew of the problem with the sewer connection when he rented the premises. There is therefore no reason for us to disturb the trial court's findings. See id. at 1178–79; Ashton v. Ashton, 733 P.2d 147, 150 (Utah 1987). We would let stand the trial court's conclusion that the landlord did not engage in a deceptive act under the UCSPA.

The tenant also asserts that the landlord's actions were unconscionable under section 13–11–5 of the UCSPA.[17] Under the statute, unconscionability does not require proof of specific intent but can be found by considering circumstances which the supplier "knew or had reason to know." Utah Code Ann. § 13–11–5(3) (emphasis added). The determination of unconscionability is a question of law. Utah Code Ann. § 13–11–5(2). This court is therefore free to review the record and make its own conclusions as to this determination. See State ex rel. Div. Consumer Protection v. Rio Vista Oil, Ltd., 786 P.2d 1343, 1347 (Utah 1990); Henretty v. Manti City Corp., 791 P.2d 506, 510 (Utah 1990).

In Resource Management Co. v. Weston Ranch and Livestock Co., 706 P.2d 1028 (Utah 1985), we discussed the doctrine of unconscionability at length. The discussion was based on standards articulated in the Uniform Commercial Code, see U.C.C. § 2–302, comment 1, and on contract law in

---

17. The trial court did not make a finding as to unconscionability.

general. The principles there discussed are, for the most part, applicable here.

In *Resource Management,* the court distinguished "substantive" and "procedural" unconscionability. Procedural unconscionability focuses on the manner in which the contract was negotiated and the circumstances of the parties, 706 P.2d at 1041, and can be characterized as the "absence of meaningful choice" and a "gross inequality of bargaining power." *Id.* at 1042 (quoting *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965)). Substantive unconscionability examines the relative fairness of the obligations assumed; it requires terms "so one-sided as to oppress or unfairly surprise an innocent party," *Resource Management,* 706 P.2d at 1041 (citing *Bekins Bar V Ranch v. Huth,* 664 P.2d 455, 462 (Utah 1983)); *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.,* 89 Nev. 414, 514 P.2d 654, 657 (1973), or "an overall imbalance in the obligations and rights imposed by the bargain," *Bekins Bar V Ranch v. Huth,* 664 P.2d at 462.

Under contract law, unconscionability is determined as of the time the parties enter into the contract. *See Resource Management,* 706 P.2d at 1043. In contrast, under the UCSPA, an unconscionable act or practice may occur "before, during or after" a consumer transaction. In this case, therefore, consideration can be given to the landlord's actions during the course of the tenancy, as well as to his act of renting the premises initially.

As discussed above, there is no evidence that the landlord knew when he rented the premises that there was a problem with the sewer connection, nor is there any indication that he had reason to know of the problem at that time. Further, although the water was not turned on, the tenant had the opportunity to inspect the premises before she rented the house. By her own testimony, she did not go down into the basement when she first looked at the house. Thus, at the time the lease was signed, the tenant had a meaningful choice in whether or not to rent the house, and the bargaining power of the parties was relatively equal since both had the same oppor-

tunity to inspect the premises. As a matter of law, the landlord did not act unconscionably in renting the premises to the tenant initially.

The relative positions of the parties changed dramatically, however, once the tenant moved into the house, discovered the problems, and informed the landlord. According to the housing inspector's testimony, by December 1988 the premises exhibited " 'dozens' of violations of the Utah Housing Code which posed substantial dangers to the health and safety of the occupants, including the presence of raw sewage on the sidewalks, and stagnant water in the basement with a foul odor." The landlord's repeated failure to repair the sewage problem after he had knowledge of its existence was unconscionable. At that point, the tenant's only choice was either living without hot water, with foul odors permeating her residence and standing water and raw sewage in the basement, or moving out of the house and incurring the substantial expenditure of time, energy, and money that relocation requires. This amounted to no meaningful choice at all. *See Resource Management,* 706 P.2d at 1042. Substantively, from that point until the premises were ordered vacated, the bargain became one with terms "so one-sided as to oppress" the tenant, *id.* at 1041, creating "an overall imbalance in the obligations and rights imposed by the bargain." *Bekins Bar V Ranch v. Huth,* 664 P.2d at 462.

The division investigated the premises twice during December 1988. The tenant testified that she called the housing inspectors once, presumably in November or early December. The evidence indicates that it was the landlord who called the inspectors the second time. The purpose of that second call, by the landlord's own admission, was to have the house condemned "so [the tenant] would move out." The landlord's efforts were successful; the second inspection resulted in a notice ordering vacation of the premises until the "life-safety" threats were corrected. Those threats included the lack of connection to the sewer system, the presence of stagnant water in

the basement, and other critical problems. *Id.*

The landlord's direct admission that he had the house effectively condemned for the purpose of evicting the tenant rather than repairing the sewer system is shocking. Tenants in Utah have a right to be evicted only by judicial process. *See* Utah Code Ann. § 78-36-12. The landlord's actions violated state policy disfavoring self-help evictions. He also abused the building inspection process. His acts were unconscionable under the UCSPA. Once the tenant had moved into the house and discovered the unsafe and unsanitary conditions, her only choice was to live with those conditions or incur the burdens of moving. That is a result which "no decent, fair-minded person would view ... without being possessed of a profound sense of injustice." *Resource Management*, 706 P.2d at 1041 (quoting *Carlson v. Hamilton*, 8 Utah 2d 272, 332 P.2d 989, 991 (1958)). Thus, the author and Justice Zimmerman would hold that the landlord's conduct was unconscionable under the UCSPA.

A consumer has an express statutory right to bring an action under the UCSPA even if he seeks or is entitled to damages or otherwise has an adequate remedy at law. Utah Code Ann. § 13-11-19(1). The tenant in this case should not be precluded from bringing an action under the statute *and* under the common law warranty of habitability.

## CONCLUSION

The decision of the trial court dismissing the tenant's counterclaim for declaratory relief under the UCSPA is affirmed. Its determination regarding the implied warranty of habitability, however, is reversed. We remand this case to the trial court to determine whether the landlord breached the implied warranty of habitability as defined in this opinion. If the trial court determines that he was not in breach, the landlord will be entitled to payment for all the past due rent. If the trial court determines that his breach of the warranty of habitability totally excused the tenant's rent obligation (i.e., rendered the premises

virtually uninhabitable), the landlord's action to recover rent due will fail. If the trial court determines that the landlord's breach partially excused the tenant's rent obligation, the tenant will be entitled to a percentage rent abatement for the period during which the house was uninhabitable.

ZIMMERMAN, J., concurs.

HOWE, Associate Chief Justice (concurring in part):

I concur in part I of the majority opinion. I call the reader's attention to the fact that this case arose before the 1990 enactment of the Utah Fit Premises Act, Utah Code Ann. §§ 57-22-1 to -6, in 1990, and we have not addressed in this opinion the effect of that legislation on the issues presented by this case.

I express no opinion on part II of Justice Durham's opinion since it appears to me that it is not necessary to consider the UCSPA to give the tenant the relief to which she is entitled.

HALL, C.J., and STEWART, J., concur in the concurring opinion of HOWE, A.C.J.