Clarkstown Seniors Phase I LLC. v Sheffield (2024 NY Slip Op 51071(U))

[*1]

Clarkstown Seniors Phase I LLC. v Sheffield

2024 NY Slip Op 51071(U)

Decided on August 15, 2024

Justice Court Of The Town Of Clarkstown, Rockland County

Bongiorno, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 15, 2024
Justice Court of the Town of Clarkstown, Rockland County

Clarkstown Seniors Phase I LLC., Petitioner,

against
Malinda Sheffield, Respondent.

Docket No. 24050399

Edward J. Quilice, Esq., Silverstein Law P.C., for Petitioner
Malinda Sheffield, Pro Se

Michael E. Bongiorno, J.

Petitioner Clarkstown Seniors Phase I LLC. ("Clarkstown Seniors") commenced this nonpayment summary proceeding against Respondent Malinda Sheffield, alleging Respondent's failure to pay rent for 1 Hyenga Way, Apartment 1304, Nanuet, New York, 10954 (the "Apartment") for March 2023, and from August 2023 to August 2024, inclusive. The monthly rent was $ 1,520.00 [FN1]
per month, thus the 14-month arrears totaled $21,008.00.
The Court conducted a trial on July 29, 2024, July 31, 2024, and August 5, 2024. At trial Clarkstown Seniors property manager Ana Ramirez and building superintendent Kendrick Valdez testified for Petitioner; Respondent testified on her own behalf. Both parties entered numerous exhibits into evidence.
TRIAL
Ramirez testified that Respondent had leased the Apartment since November 2019, [*2]renewing it thereafter. The current lease extension terminates on October 31, 2024.[FN2]
Respondent admitted that she had not paid rent for the period alleged by Petitioner. 
Respondent raised several issues concerning the conditions in her Apartment during the period at issue. Respondent testified to a May 2023 leak in the hallway outside her apartment but added it did not directly impact her Apartment. Respondent testified to a September 2023 leak in her apartment that caused water to pool on the carpet near and under bed. Respondent reported the leak to the building superintendent Valdez, who arrived with a maintenance man to inspect the Apartment and attempted to find the source of the leak and repair it. A wall in her Apartment was wet. Respondent testified that Valdez did not respond when she asked him when he would be coming back to remedy the leak. According to Respondent, in October her bedroom wall and carpet were wet and that she asked Valdez several times when he would be returning to her Apartment to fix the leak. 
Respondent testified that beginning in October and extending into December her wall remained wet and that she started to feel ill. She suffered from coughing, sneezing and headaches, and had difficulty sleeping. She stopped sleeping in the bedroom because it smelled sour and of mildew and she lost some time at work. She attributed her illness to the wet conditions in her Apartment.
Superintendent Vasquez testified that the water problem Respondent faced emanated from a leak on the roof over her unit and affected her Apartment, her neighbor's apartment, and the apartment immediately beneath Respondent's. Petitioner hired a contractor to repair the roof, but this first effort failed leading to, in December 2023, the hiring of a second contractor to repair the roof. Several days of rain in December caused water damage to the walls and ceiling of the apartment 1204, the one immediately beneath Respondent's apartment. According to Valdez, Respondent denied access to her Apartment at that time even though the leaking water came from her Apartment's subfloor. In December, on one occasion Respondent denied Vasquez access to her Apartment. On December 20, 2023, Vasquez and two contract workers sought access to Respondent's Apartment. Respondent allowed Vasquez in, but denied access to the contract workers because she did not know them. Vasquez testified he did not observe any water damage at that time.
In December 2023 Respondent contacted the Rockland County Department of Health (RCDOH) which inspected her apartment. They advised her to hire a mold inspector as they did not conduct formal mold inspections. The RCDOH noted cracks in the bedroom wall from floor to ceiling, stained and damaged bedroom carpet, cracks in a living room wall, and the need for caulking around the kitchen countertop. RCDOH notified Petitioner of the need to remedy those issues, which were addressed in January 2024. (Petitioner's Exhibit 9).
Respondent hired H.S.N.T Mold Inspections ("H.S.N.T.), and inspector John Skelly conducted an inspection of Respondent's Apartment on January 3, 2024. (Respondent's Exhibit KK). Skelly found significant mold under Respondent's bed, in her bedroom carpet, and inside her bedroom walls. Respondent closed off her bedroom and notified Clarkstown Seniors about the mold. Petitioner hired ServePro to remediate the mold infestation in Respondent's bedroom. The first remediation attempt took place over several days in early January 2024. This remediation effort failed as a second, post-remediation inspection by Skelly determined that [*3]mold was still present in Respondent's Apartment. A second ServePro remediation took place in late January (starting approximately on January 25, 2024)[FN3]
, took several days, and involved opening the walls, and eventually replacing the floor. During the first week of February 2024, management repaired the open wall(s) with new sheetrock, painted the Apartment and replaced the floor. 
Respondent paid a total of $600.00 for each H.S.N.T. mold inspection. While she was advised to stay elsewhere during the remediation, she continued to live in her Apartment, sleeping in her bathroom and occasionally sleeping at her workplace. After the completion of the February remediation, Respondent returned to her bedroom and had no further mold problems. Respondent acquired air purification and drying equipment to dry the air in her apartment. At the second day of trial Respondent testified that since the first trial date she observed some cracks and colored spots on her ceiling as depicted in the photographs entered into evidence as Respondent's Exhibit HH. Respondent presented no evidence that the spots or cracks indicated a new mold problem or caused any problem for her. Clarkstown Seniors requested permission of inspect the new cracks and spots, but Respondent denied that request since it did not present, in her opinion, an emergency.

DISCUSSION
Admittedly, Respondent did not pay any of the $ 21,008.00 past due rent covering a timeframe of 14 months and has offered no reason for her failure to pay. Respondent asserted a defense of nonpayment due to Petitioner's breach of the warranty of habitability. RPL § 235-b (1) requires a landlord to, among other things, maintain an apartment. This "implied warranty protects . . . against conditions that materially affect the health and safety of tenants or deficiencies that in the eyes of a reasonable person . . . deprive the tenant of those essential functions which a residence is expected to provide." Solow v. Wellner, 86 NY2d 582, 588 (1995), quoting Park West Mgt. v. Mitchell, 47 NY2d 316, 328 (1979). Where a landlord has breached the warranty of habitability, the court may, among other things, award a rent abatement representing the difference between the fair market value of the premises if they had been as warranted, as measured by the rent reserved under the lease, and the value of the premises during the period of the breach. Park West Mgt. v. Mitchell, supra at 329; AMML Realty Corp. v. Townsend, 64 Misc 3d 1229(A)(Mount Vernon City Court 2019).
The Court of Appeals recognizes that the appropriate measure of damages for a breach of the warranty of habitability was not susceptible to a precise determination and that a case-by-case calculation is warranted employing four factors: (1) severity of the conditions; (2) notice to the landlord; (3) duration of the condition of disrepair after notice to the landlord; and (4) the effectiveness of the efforts of the landlord to remedy the disrepair. Park West Mgt. v. Mitchell, supra at 326; AMML Realty Corp. v. Townsend, supra.
After trial and consideration of the evidence, the Court finds that Petitioner breached the statutory implied warranty of habitability for the months of October 2023 to February 2024, inclusive. Management was aware of the leaky roof condition and despite efforts to repair the leak, failed in their initial efforts to do so. This led to water damage and mold growth in Respondent's apartment. Respondent notified Vasquez as to the leak(s) and water damage in her [*4]apartment, yet Vasquez failed to observe any water damage during his December 20, 2023, inspection. While Respondent sometimes denied Petitioner's super and contractors access to her apartment, her actions had no impact on the repeated attempts to repair the leaking roof and did not significantly impede remediation efforts. Once Respondent recognized the mold infestation in her apartment — following Skelly's inspection(s) — she immediately contacted management and granted full access to her apartment for the two ServePro remediation efforts. While Respondent may have been at times difficult to deal with  and while management may have operated in good faith  the fact is several repair efforts failed, and the mold problem was not identified until January 2024 after Respondent hired Skelly's inspection firm.
Courts have awarded a broad spectrum of abatements, granting rent abatements of 10% to 20% for minor breaches of the warranty of habitability, 30% for moderately serious breaches, and 50%-60% for the most serious breaches, such as no or inadequate heat for several months. Dumbadze v. Saxon Hall Owner, LLC, 93 AD3d 756, 757 (2d Dept. 2012)(increasing 10% abatement to 25% where plaintiff's evidence demonstrated recurring issues with "bubbles" forming on ceiling in bedroom and living room and at least one instance of ceiling collapsing in the living room causing injury); Century Apartments, Inc. v. Yalkowsky, 106 Misc 2d 762 (NY City Civ. Ct. 1980)(10% abatement for water damage and additional 20% for each month without adequate water); Whitehall Hotel v. Gaynor, 121 Misc 2d 736 (NY City Civ. Ct. 1983)(10% monthly abatement beginning on the second month of occupancy for a protracted renovation period and lack of sufficient explanation as to why the work took so long); Baldwin Merrick Associates v. Relles, 20 Misc 3d 1112(A) (Nassau Co. Dist. Ct. 2008)(15% abatement for poor condition of the bedroom ceiling, including spackled and patched sheetrock leading to dirty water leaking from the ceiling and mold). 
Here, Respondent suffered a serious mold infestation in her apartment that was not addressed until after being diagnosed in January 2024. When superintendent Vasquez inspected the Apartment in December, he observed no evidence of water damage. This is an instance where the worst condition — the mold — was not identified for a substantial period of time.
Consequently, the Court awards Respondent a rent abatement for water damage and mold for the months of October 2023 to February 2024 as follows: (1) September 2023: a 10% abatement, lowering rent for that month to $1,368.00; (2) October 2023: a 10% abatement, lowering rent for that month to $1,368.00; (3) November 2023: a 10% abatement, lowering rent for that month to $1,368.00; (4) December 2023: a 10% abatement, lowering rent for that month to $1,368.00; (5) January 2024: a 60% abatement lowering rent for that month to $608.00; (6) February 2024: a 20% abatement, lowering rent for that month to $1,216.00. The Courts finds no abatement for the other 8 months at issue. The Court also finds for Respondent and awards a further $1,200.00 abatement for the money paid for the two mold inspections. Thus, the Court enters a money Judgment in the amount of $18,256 for Petitioner.
Respondent also raised the issue that since she obtained and Petitioner accepted Emergency Rental Assistance Program ("ERAP") payments on two occasions — September 22, 2021, and, following an appeal, January 9, 2024 — that she cannot be evicted for 12 months after the landlord received the first rental assistance payment. See L 2021, c 56, part BB, §9 (2) (d)(iv), as amended by L 2021, c 427, part C, subpart A, § 5. However, this provision only applies to evictions for expired leases and holdover tenancies; it does not apply to a nonpayment proceeding, which is the case here. Additionally, Respondent's landlord received Respondent's first ERAP payment on September 22, 2021, almost three years ago, way beyond the one-year [*5]time limit for the eviction stay provision of the statute.
Further, Petitioner is awarded a final Judgment of Possession and Warrant of Eviction, with the Warrant of Eviction stayed until September 30, 2024. Respondent is also directed to pay rent for September 2024. 
The foregoing constitutes the Decision and Order of this Court.
HON. MICHAEL E. BONGIORNO
TOWN JUSTICE
Dated: August 15, 2024
New City, New York

Footnotes

Footnote 1:Initially Petitioner sought $1,588 in monthly rent for the August 2023 to August 2024 period because of a rent increase. At trial Petitioner conceded that the rent increase had not been properly noticed and reduced their claim to $1,520 per month.

Footnote 2:Petitioner entered the lease into evidence as Exhibit 1.

Footnote 3:Respondent admitted on the stand that she was very bad at recalling the exact dates when certain events occurred.